## HARRIS et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 5841.

United States Court of Appeals
Fourth Circuit.

April 8, 1949.

Stanley Worth, of Washington, D. C. (Blair, Korner, Doyle & Appel, of Washington, D. C., on the brief), for petitioner.

Sumner M. Redstone Sp. Asst. to Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack and L. W. Post, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PER CURIAM.

The main question in this proceeding to review the decision of the Tax Court is

whether the Commissioner of Internal Revenue has met the burden resting upon him to prove that the taxpayers, Frank Harris and Victoria Harris, his wife, fraudulently reported less net income than they actually received in certain years between 1934 and 1942.[1] The Tax Court held in favor of the Commissioner for deficiencies and penalties for the years 1934, 1936–37, 1939, and 1941–2, amounting in the aggregate to $7690.84. The taxpayers pleaded the statute of limitations as to all years before 1941, and showed that in the absence of fraud, Section 6 of the Current Tax Payment Act of 1943, 57 Stat. 126, 145, 26 U.S.C.A. § 1622 note, prevented the assessment of any deficiency for 1942. The Commissioner took the position that neither defense could properly be made, since the taxpayers filed false and fraudulent returns for the years in question.

Section 1112 of the Internal Revenue Code, 26 U.S.C.A. § 1112, provides that "in any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner." In order to meet this burden, the revenue agents endeavored to show the taxpayer's net income for each of the years in question by comparing his net worth at the beginning and end of the year. They adopted this method because the taxpayer refused to cooperate with them in their investigation and because he denied that he had any books and records from which his gross income for each year and the allowable deductions therefrom could be ascertained.

The taxpayer owns about 400 acres of farm land in North Carolina, some 250 of which are under cultivation. At the time of the trial below in October, 1947, he was 72 years of age, and after 1940, because of ill health, he rented his farms to share-croppers. Besides feed and products for home consumption, he raised tobacco, his principal crop, and some cotton for sale. His only other source of income consisted of interest on United States Government bonds and on mortgage loans, all of which were recorded. He and his family live with extreme simplicity in a small farmhouse with no telephone, heating plant, or other conveniences except lights; they rarely go to town and have never seen a motion picture, or gone on a vacation. They raise practically all their food, and their living expenses are relatively negligible.

The taxpayer reads and writes with great difficulty, and has never kept any record of his business transactions. Besides the recording of his mortgages, the only record with respect to them is the notation on the mortgage notes themselves of payments of interest and principal. At the close of each year, the taxpayer collected his tobacco and cotton bills (statements issued by a warehouse as selling agent, concerning the particulars of the sales), and his receipts evidencing disbursements, and with the help of his daughter-in-law, prepared a summary which was generally the result of three to five hours' work. Some expenses had to be estimated and the taxpayer conceded that it was impossible to be certain that he reported all the income he should have. He testified, however, that he conscientiously tried to report his income accurately, and intended to pay all the tax that was due. The summary thus prepared was turned over to taxpayer's accountant, who prepared the returns. Neither taxpayer's daughter-in-law nor his accountant had any independent knowledge of the accuracy of the items in the summary.

The number and variety of the activities and investments from which the taxpayer derived his income, and his failure to keep records of his transactions, made it impossible for the government to state his annual income with complete accuracy. Yet there are certain outstanding facts, supported by the proof, which strongly indicate that he was wilfully and deliberately, that is, fraudulently misstating his taxable income during the period under investigation. It is true that he was deficient in

---

[1] 1942 was the only year in issue in which Frank Harris, hereinafter called the taxpayer, filed a joint return with his wife, and the Tax Court therefore properly dismissed the case against her except as to that year.

those capacities that make for accurate accounting, but he was prudent and canny enough to amass a considerable fortune in the business world so that at the end of the period his net worth was substantially greater than it was at the beginning. This fact cannot be denied, even though the estimate of the Tax Court that he was worth some $80,000 more in 1942 than in 1934 may be disputed.

■ Definite proof of deliberate understatement of income is found in the tax returns in respect to the item of interest which the taxpayer received from his investments in government securities and farm mortgages, and which is not open to dispute. The evidence indicates that during the period the taxpayer owned $30,000 in Government bonds on which the income approximated $975 annually; and also 6 per cent. mortgage notes which, according to evidence produced by the taxpayer, varied in amount during the tax years from $20,000 to $30,000. To these amounts should be added interest on bank accounts (at a rate not disclosed) which ranged from $10,000 in 1934 to $55,000 in 1941. Yet he reported his income from interest to be only $208.73 in 1934, $500 in 1938, $600 in 1941, $941.67 in 1942 and nothing in other years. The following statement from the court's opinion is well substantiated by the proof:

"Whatever doubts may surround the amount of entire net income, the evidence adduced is conclusive that petitioner has owned United States Government bonds of a face value of $30,000 since prior to 1934, and the annual interest on these bonds was about $975—slightly more before exchanges for new issues in 1934 and 1935. The record is convincing that during all of the taxable years petitioner held 6 percent mortgage notes in aggregate face amounts ranging from $19,888 in 1938 to $31,545 in 1937 and in addition, interest-bearing bank accounts ranging from $10,000 in 1934 to over $55,000 in 1941, on which the rate of interest is not indicated. We have noted above that petitioner's bonds and mortgages should have produced annually at least $2,375. It is certain that the interest from Government bonds was about $975 annually. Nonetheless petitioner reported as interest received $207.93 in 1934, $500 in 1938, $600 in 1941 and $941.67 in 1942. Of the last amount $300 only was described as interest on Government obligations. He reported no interest at all in other years. The assertion of mere forgetfulness can not be credited in a professional lender who has operated profitably for many years. We believe that these omissions were intentional and fraudulent."

This statement demonstrates that the Commissioner has borne the burden of proof to show fraud on the part of the taxpayer, especially when the persistent recurrence of the understatement of interest in each of the years in the nine year period is considered. It also renders unnecessary a consideration of the taxpayer's contention that the authorities hold that a net worth statement may be resorted to to measure the unreported income of a taxpayer only if there has been a prior showing by extraneous evidence of a gross misstatement of income. Calafato v. Commissioner, 42 B.T.A. 881, affirmed, 3 Cir., 124 F.2d 187; Hoefle v. Commissioner of Internal Revenue, 6 Cir., 114 F.2d 713.

■ Since fraud has been established, it remains to consider whether there was sufficient evidence to support the Tax Court's decision that deficiencies in tax and penalties were due; and it must be borne in mind that in this posture of the case the burden is upon the taxpayer to overcome the presumption that the Commissioner's determinations are correct. Snell Isle, Inc., v. Commissioner, 5 Cir., 90 F.2d 481; Rogers v. Commissioner, 6 Cir., 111 F.2d 987; Greenfeld v. Commissioner, 4 Cir., 165 F.2d 318; Leonard Willits, 36 B.T.A. 294. The investigation was fraught with difficulty and the taxpayer was able to demonstrate that there were errors in the Commissioner's calculations with the result that the court found that the aggregate net taxable income for the years in question was $58,807.45 rather than $123,450.15 as the Commissioner had found, and that the aggregate deficiencies and penalties found by the Commissioner to be $24,569.42 should be reduced to $7,690.84.

■ Originally the Tax Court admitted in evidence over the taxpayer's objection

an exhibit prepared by a revenue agent which was based upon facts and figures taken from bank records of the taxpayer's deposits and withdrawals, and from the land records showing his title to the farms and mortgages, and in part consisted of the agent's own estimate of property values. The supporting documents for this calculation, however, were not offered or produced in evidence and the exhibit was clearly inadmissible. We think, however, that the error was harmless because the court did not accept the agent's calculations but eliminated from consideration calculations which were shown to be erroneous, and confined itself to the amount of the mortgages shown by the taxpayer's own evidence, and an examination of the bank deposits and withdrawals which were admitted by the taxpayer to be correct.[2] For example, there was error in the Commissioner's original statement of the amount of government bonds owned by the taxpayer; and since the evidence showed that the amount held by him did not vary materially during the period, they were omitted from the calculations of net worth. Again, it was not possible from the land records to ascertain the value of the lands, buildings and equipment, but, as the evidence indicated only slight variation in these items during the period, they were also eliminated. Depreciation, which was not itself a large item, was eliminated, but as an offset the living expenses of the family estimated to run from $1,000 to $1,500 per year were also eliminated.

The taxpayer points out that an element of uncertainty and conjecture remains in the final determinations, and this criticism is not without foundation. The Government agents did not attempt to check the sales records of the agents who disposed of the farm products from which a substantial part of the taxpayer's income was derived, although such an investigation might have been made. Moreover, it was not always possible to trace with complete accuracy the source of the deposits or the disposition of the withdrawals, since the taxpayer failed to produce any checks or other records. The Government, however, made an earnest effort to identify the transactions and in one year, 1936, when the final figures indicated an increase of net worth of $24,362.40, the court treated only one-half thereof, or $12,181.20, as net income, since the former amount seemed abnormally large and the evidence indicated somewhat vaguely that the taxpayer had been engaged in trading in real estate and hence the great increase in the bank balance was probably attributable to the deposit of the proceeds of sale.

Notwithstanding the uncertainty and lack of precision which necessarily pervade the calculations on which the Tax Court's determinations are based, we do not feel justified in setting them aside. It is admitted that the taxpayer's income, aside from interest on government bonds, was derived entirely from sales of farm products and from mortgage loans, and hence the possibility that the notable increase in his bank deposits was derived from unknown sources is minimized. In addition, it is of importance that the comparison of the taxpayer's net worth at the beginning and end of the year was not confined to a single year but was repeated over a series of years so that the chance of error is thereby lessened. Most important, of course, is the failure or refusal of the taxpayer to produce any records or to render such assistance to the court, although represented by able counsel, as would enable it to make its findings with accuracy and precision. Under such circumstances, approximation in the calculation of net income is justified. See Helvering v. Safe Deposit Co., 316 U.S. 56, 66-67, 62 S.Ct. 925, 86 L.Ed. 1266, 139 A.L.R. 1513; Cohan v. Commissioner, 2 Cir., 39 F.2d 540, 543. The following statement from the Tax Court's opinion seems to us to be fully justified:

"In considering the evidence we have been constantly mindful of petitioner's handicap of illiteracy and of credible testi-

---

[2] Since, as taxpayer testified, it was his custom to bank all his funds as he received them except for a negligible amount he kept in a safe deposit box, there is little danger that the increases in bank deposits during the years in question reflect anything other than increases in current income.

mony that he enjoys a reputation for commercial integrity in his community. But as petitioner has been successful in his financial operations with individuals, we can not credit his statement that the amounts of principal and interest due to him are unrecorded or forgotten. He has evidently conducted his loan business with care. He owes to the Government an equal care in accounting for his profits from it, and having failed to account for most of his receipts, we find that his returns for 1934, 1936, 1937 . . ., 1939, 1941 and 1942 were false and fraudulent with intent to evade tax and sustain imposition of the 50 per cent penalty for fraud. Because of fraud the income tax for 1942 is not forgiven. Section 6, Current Tax Payment Act of 1943."

Affirmed.