**William O'DWYER and Sloan O'Dwyer, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 7665.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 13, 1959.

Decided April 21, 1959.

Paul O'Dwyer, New York City, for petitioners.

Myron C. Baum, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before SOBELOFF, Chief Judge, and PAUL and BOREMAN, District Judges.

BOREMAN, District Judge.

William O'Dwyer and Sloan O'Dwyer here petition for review of decisions of the Tax Court determining deficiencies in the payment of income taxes for the years 1949, 1950 and 1951. For those years they filed returns as husband and wife. The findings of fact and opinion of the Tax Court are reported in 28 T.C.

698, November 1957. The 1949 return was filed at New York but the 1950 and 1951 returns were filed at Baltimore. To avoid review of proceedings at a single trial by two circuits, the parties agreed to review by this circuit.

William O'Dwyer was Mayor of the City of New York from November 1945 until he resigned in August 1950. He had earlier held other public offices. On August 30, 1950, he was appointed Ambassador to Mexico and served in that capacity until his resignation in December 1952.

The Commissioner of Internal Revenue determined that William O'Dwyer received $10,000.00 from one Crane in 1949 which constituted unreported taxable income. With respect to 1950 and 1951, the dispute related to the disallowance of unreimbursed expenditures claimed by said O'Dwyer to have been made by him as Ambassador, and the failure to report, for the year 1951, an item of $1500.00 represented by an unexplained deposit made by Sloan O'Dwyer, from Mexico, in a joint bank account carried in her name and the name of her mother in a New York bank. The Commissioner determined deficiencies against petitioners for each of the three years, although the Tax Court modified and reduced the asserted deficiencies arising from the disallowance of claimed official expenditures as Ambassador. These determinations are attacked by taxpayers as arbitrary, capricious and improperly motivated.

By direct and positive assertions, as well as by innuendo, insinuation and intimation, taxpayers charge that the determinations of the Commissioner were influenced by political considerations and were arbitrary and capricious, without foundation.

■ It is a well-established and recognized principle that a determination, by the Commissioner of Internal Revenue, of deficiencies in a taxpayer's income tax is presumed to be correct, and the burden in the Tax Court is upon the taxpayer to prove its incorrectness. Lias v. C. I. R., 4 Cir., 1956, 235 F.2d 879; Harris v. C. I. R., 4 Cir., 1949, 174 F.2d 70; Miles-Conley Co. v. C. I. R., 4 Cir., 1949, 173 F.2d 958; Greenfeld v. C. I. R., 4 Cir., 1947, 165 F.2d 318; Miller Mfg. Co. v. C. I. R., 4 Cir., 1945, 149 F.2d 421. See also 47 C.J.S., Internal Revenue § 901 (1946).

The Government, although armed with this presumption of correctness upon which it could have elected to rely, goaded by taxpayers' accusations, produced witnesses before the Tax Court whose testimony related primarily to the alleged receipt by William O'Dwyer of the sum of $10,000.00 in 1949. These witnesses were Crane, Dolan and Wilders and they were subjected to extensive, vigorous and grueling cross-examination. Crane and Dolan had given statements in writing, pertaining to the same subject matter, to the Internal Revenue Agents and these statements were a part of the Commissioner's file. Witness Wilders had made no written statement to the agents. It is to be noted that the taxpayers did not appear before the Tax Court as witnesses to challenge any evidence offered by the Government, nor did they produce any other witnesses to testify in their behalf.

Taxpayers had procured the issuance of two subpoenas *duces tecum* addressed to the Regional Commissioner of Internal Revenue, one of which, as the Tax Court noted, demanded the production before the Tax Court of: (1) The complete 1949 and 1950 Revenue Agents' reports, including the confidential elements thereof; (2) all of the information from which it was determined that the petitioners understated their 1949 and 1950 income; (3) all affidavits and all statements or transcripts of statements, under oath or not, submitted or made by the petitioners, to any office or officer of the Internal Revenue with respect to their tax liabilities for the years 1949 and 1950; (4) transcript of statement of interview with William O'Dwyer, witness, held in Room 1007, Intelligence Unit, 253 Broadway, New York, N. Y., on March 28, 1951.

The other subpoena required the production of complete 1951 Revenue Agents' reports, including the confidential elements thereof; all of the information from which it was determined that the taxpayers understated their 1951 income; and all affidavits and all statements or transcripts of statements, under oath or not, submitted or made by the petitioners to any office or officer of the Internal Revenue with respect to their tax liabilities for the year 1951.

The Commissioner refused to comply with the requirements of the subpoenas and taxpayers made two motions before the Tax Court for orders directing compliance, which motions were overruled. In refusing to comply with the subpoenas, Government counsel stated that, although declining to hand over the Government's files, he was not thereby making a blanket refusal to produce specific items. The Tax Court made it clear that its ruling was merely a "denial of the broad request * * * for all the papers and all the files relating to these cases", indicating that it would rule upon request for specific items when they became pertinent. Some of the items requested by taxpayers were made available by the Government. The Commissioner voluntarily produced William O'Dwyer's statement of March 28, 1951, containing an absolute denial of the receipt of $10,000.00 in the year 1949, the delivery of which sum to said taxpayer was the subject of the testimony of Crane and other witnesses. The Commissioner produced a statement of assets and liabilities which had been submitted by the taxpayers, and later voluntarily delivered to taxpayers' attorney the written statements of two of the Government's witnesses, namely, Crane and Dolan. Thus there remained in issue, in substance, only the Agents' reports and taxpayers' counsel made a specific demand therefor. The Tax Court refused to direct production upon the ground that taxpayers were not entitled to such documents merely upon the basis of a general claim that the determination of deficiencies were arbitrary and improperly motivated.

Following the denial of the motions to direct compliance with the subpoenas, taxpayers then rested their case and failed to produce any witnesses to testify concerning any of the issues. It is the contention of taxpayers that the denial of these motions amounted to a denial of constitutional due process and that relevant statutes and rules, including the Administrative Procedure Act, required production of such records for scrutiny by taxpayers and the reviewing tribunal.

In a colloquy between the Tax Court and counsel for taxpayers, counsel admitted that the determination of fact made by the Commissioner is one which the taxpayers are obliged by law to refute, and further stated: "We had hoped that if the Government would present the record in toto and expose it here, that we might have something even much more sinister than that in writing and I respectfully submit if we see it, we will find it. * * * Your Honor, the only thing that I had in mind was this, that in these days when we have complaints with respect to taxation, would it not be a wholesome thing if for the first time the Government came forward and opened up their files to a taxpayer as they should? There is no reason why there should be any secrecy between a Government and its taxpayer. If they see fit to take taxes from him, at least they should show him the conditions under which they impose the taxation."

The Court stated: "This Court is not subject to the Administrative Procedure Act. We do not review in the same sense as other courts perhaps review actions of the Federal Communications Commission or some other federal agency. We do not review in that same manner the determinations of the Commissioner. This is a trial 'de novo' and the question before me is simply whether or not the deficiencies determined by the Commissioner are correct. I have no means whatever of bringing before me the entire record, so-called, as you describe it,

that was before the Commissioner. In fact, there probably is no such record. When the Commissioner makes determination, he may have numerous documents before him. The determination may be made on the basis not only of those documents, but also on the basis of various conversations which may or may not be reduced to writing. And it would be wholly impractical for this Court to undertake to review what you describe as the record before the Commissioner. There is no such record in any technical sense."

Counsel for taxpayers then stated: "If Your Honor please, in view of Your Honor's ruling with respect to what we regard as the most important issue in this case, from a standpoint of civil rights, the Petitioner rests and will appeal in the event of an adverse ruling."

### Applicability of Administrative Procedure Act

Taxpayers contend: That the determination of the Commissioner of Internal Revenue is subject to judicial review in accordance with the provisions of Section 10 of the Administrative Procedure Act; that the Tax Court is a "reviewing court" within the meaning, and subject to the provisions of Section 10(e), (5 U.S.C.A. § 1009(e): c. 324, 60 Stat. 237, at pages 243–244); that the Tax Court must review the "whole record" of facts and circumstances upon which the Commissioner based his determination.

■ The provisions of the Administrative Procedure Act must be read and construed together and we hold that the judicial review of the "whole record" mentioned in Sec. 10(e) envisages, in the case of adjudication, a review of the record made in cases wherein Sections 5, 7 and 8 of the Act (5 U.S.C.A. §§ 1004, 1006, 1007: 60 Stat. 237, at pages 239–240: 241–242) are applicable. Where these sections apply, the administrative agency is required to hold a formal hearing within a strict statutory framework and to make up a record of the testimony and exhibits introduced thereat, upon which record the agency must base its

decision. This formal record is the subject of the review provided in Sec. 10. To hold that Sec. 10 applies to a determination of the Commissioner and that the Tax Court is a "reviewing court", within the meaning of that section, would be to hold that such determination is subject to the rigid requirements of Secs. 5, 7 and 8. Without a "record" to review, the provisions of Sec. 10(e) would be meaningless and thus inapplicable here.

■ It has been held that the Bureau of Internal Revenue is exempt from the requirements of Secs. 5, 7 and 8 of the Administrative Procedure Act. Cohen v. Commissioner, 10 Cir., 1949, 176 F.2d 394; Kennedy Name Plate Co. v. Commissioner, 9 Cir., 1948, 170 F.2d 196. The Tax Court is given jurisdiction to redetermine the deficiency asserted by the Commissioner, and in doing so it is empowered to prescribe rules of practice and procedure and is required to apply the rules of evidence applicable to nonjury trials in the United States Court of the District of Columbia and make findings of fact upon such evidence. Secs. 6213, 7453 and 7459, Internal Revenue Code of 1954, 26 U.S.C.A. §§ 6213, 7453, 7459. The Tax Court thus renders its decision only upon the evidence produced before it. The burden of proof rests upon the taxpayer, and a decision of the Tax Court based upon the failure to sustain such burden was upheld. Fairmont Aluminum Co. v. Commissioner, 22 T.C. 1377, affirmed 4 Cir., 1955, 222 F.2d 622.

■ The Tax Court, rather than being a "reviewing court", within the meaning of Sec. 10(e) reviewing the "record", is a court in which the facts are triable de novo and the burden is upon the taxpayer to come forward with evidence showing the determination of deficiency to be erroneous. We agree that the Tax Court is not subject to the Administrative Procedure Act.

### Motions to Compel Compliance with Subpoenas Duces Tecum

Having determined that the Tax Court was not required to review the "record"

before the Commissioner, consideration is given to the subpoenas *duces tecum* and the denial by the Tax Court of motions to compel compliance therewith.

Certain specified documents and statements mentioned in the subpoenas were voluntarily produced by the Government as hereinbefore shown, leaving only the agents' reports and confidential information in issue. The material so produced may or may not have been pertinent to the inquiry before the Tax Court but, upon insistent assertions of pertinency by counsel for taxpayers, production was not refused.

■ Counsel for taxpayers concede that the Tax Court has no "discovery" jurisdiction. Referring to the demands for production as contained in the subpoenas, the Tax Court said: "Although the foregoing appear to give some color of compliance with our Rule 44(c) [26 U.S.C.A. § 7453], requiring that the subpoena 'shall number, set forth separately, and describe adequately each item to be produced', it is plain, not only from item (2) but also from statements made by counsel during the course of the hearing as well as the accompanying affidavit of counsel, that petitioner was seeking to have 'the records and files of the respondent * * * produced and opened to inspection by the petitioner' ".

The affidavit of counsel accompanying the motions to compel compliance contained scurrilous and scandalous accusations, portions of which are as follows: " * * * the representatives of the Internal Revenue Department are not interested in collecting taxes from petitioner, but in creating political capital out of its assessment and in using every instrumentality of the Government, including the Courts, to accomplish that purpose. * * * This may be called a tax case but in truth it is not. The Government may attempt to give it all the trappings of a tax proceeding, but it cannot escape the truth. Unless the curtain of secrecy, which the Government seeks to draw over its activities, is removed, the sham which led to this so-called tax case, will be seen in its true light. * * * Too often these days do we find people robbed of their employment, and robbed of their good name, by illegal, improper, distorted and often anonymous information which the Government Agencies do not believe but see fit to use for ulterior purpose. * * We are horrified by the soviet example of the cult of the individual, and a Government run to suit personal ambitions."

What an indictment! Counsel for the Government moved to expunge the affidavit from the record, describing it as a malicious and vicious document completely unfounded in truth and in principle. Counsel for the Government stated "that if Mr. O'Dwyer has any facts which he thinks proves the allegations he has made therein, I think it is incumbent upon him to prove them before such a motion remains in the files of this Court". The motion to expunge was denied and, although not called upon to do so, we volunteer the opinion that, in this particular, the Tax Court was in error. Such tactics on the part of counsel should not be overlooked or condoned under these circumstances where not one word of testimony was offered on taxpayers' behalf relative to these or any other matters.

Obviously, the use of the subpoenas was intended to aid taxpayer in conducting a fishing expedition and to raid Government confidential files for some purpose, as yet not clearly disclosed. Taxpayers had, or produced, no evidence which might tend to show that the Agents' reports or the Commissioner's files contained *no* facts which would support the determined deficiencies. Instead, they contented themselves with the broad, general and unsupported charge that the entire tax proceedings were motivated by improper political considerations, or worse.

■ In charging that the taxpayers were denied the constitutional right of due process arising from the Court's action in denying the motions to compel compliance, they rely on cases such as Simmons v. United States, 348 U.S. 397,

582

75 S.Ct. 397, 99 L.Ed. 453, and Gonzales v. United States, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467, and the holdings of the Supreme Court that a Hearing Officer acting under the Selective Service Act could not rely upon a secret F. B. I. report which was not disclosed to the registrant. Such cases are inapposite here. The Tax Court's decision was not based upon any Revenue Agents' reports or the confidential portions thereof. The evidence upon which the Tax Court acted in determining unreported income for the year 1949 was voluntarily produced by the Government and is now before this Court. Arguments based on the alleged use of secret evidence are therefore plainly inapplicable and without foundation. Under the circumstances here presented, we perceive no error in the denial of motions to compel compliance with the subpoenas or requests made for the production of the Revenue Agents' reports.

### Alleged Waiver of Presumption of Correctness

■ Although acknowledging, as shown, the obligation on the part of taxpayers to refute the Commissioner's determinations and thus admitting the presumption of correctness, taxpayers contend that, since the Government produced *some* testimony before the Tax Court, the presumption of correctness was waived. In support of this contention, they cite the following cases: J. M. Perry & Co. v. C. I. R., 9 Cir., 1941, 120 F.2d 123; Manchester Board & Paper Co. v. C. I. R., 4 Cir., 1937, 89 F.2d 315; Crude Oil Corp. of America v. C. I. R., 10 Cir., 1947, 161 F.2d 809; Gillette's Estate v. C. I. R., 9 Cir., 1950, 182 F.2d 1010; Hemphill Schools v. C. I. R., 9 Cir., 1943, 137 F.2d 961; and New York Life Ins. Co. v. Gamer, 1938, 303 U.S. 161, 58 S.Ct. 500, 82 L.Ed. 726.[1]

An examination of the holdings in these cases forces us to reject them as authority for the asserted proposition. In fact, in some instances, taxpayers have taken words out of context and have supplied an introductory phrase which twists or distorts the meaning of the selected words. A brief analysis of the cited cases is set forth in footnote 1. By presenting testimony of witnesses, the Government did not waive the presumption of correctness.

### Tax Court's Findings of Fact and Effect of Commissioner's Determination

Taxpayer, William O'Dwyer, in his written statement of March 28, 1951,

---

1. The Perry case holds that the determination of the Commissioner is presumptively correct, and, until the taxpayer proceeds with competent and relevant evidence to support his position, the determination of the Commissioner stands; further, that any finding which is *inherent* in the Commissioner's determination is also presumptively correct.

The Manchester case holds that the Commissioner's determination is presumptively correct; that the burden of proof rests on the taxpayer to prove it wrong; that the introduction of evidence tending to show the determining fact will abolish the presumption but that the taxpayer's evidence, *so introduced*, may itself destroy the taxpayer's theory and the presumption will remain.

The Crude Oil Corp. case holds that the presumption of correctness is one of law and not an inference of fact, disappearing when the taxpayer introduces evidence sufficient to sustain a contrary finding.

Gillette's Estate holds that the presumption of correctness does not constitute evidence and approves a quotation of the Supreme Court that unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid.

The Hemphill Schools case holds that once evidence is introduced by the taxpayer to show that the Commissioner's determination was wrong, the presumption disappears and the case must be decided wholly upon the evidence.

The New York Life case holds that the presumption under a policy that death was accidental is not evidence and may not be given weight as evidence, but disappears once there is competent evidence tending to show that death was suicidal and the case must be decided upon the evidence unaffected by the presumption.

which was produced by the Government at the trial, categorically denied the receipt of the $10,000.00 from Crane. On this sole question of fact, the Government offered before the Tax Court the testimony of Dolan, Crane and Wilders, but only after delivery to taxpayers' counsel of prior written statements of Dolan and Crane which were in the Commissioner's files.

The testimony of the three witnesses so presented is now reviewed. In 1949 William O'Dwyer was a candidate for re-election as Mayor of the City of New York. The Uniformed Firemen's Association of New York City (hereinafter referred to as UFA) was an organization of city firemen which, like most such organizations, was active in furthering the interests of its members and, at the time (1949), was interested in legislation relating to pensions for firemen. Having received assurance that O'Dwyer would give his support to such legislation, the UFA decided to lend its support to his candidacy, including a financial contribution.

John P. Crane was the President of the UFA and one Jerry Finkelstein was manager of O'Dwyer's campaign. In response to solicitation from Finkelstein for a contribution to the campaign, Crane promised that the UFA would make a contribution but that it would be made to O'Dwyer personally. At Finkelstein's request, it was agreed that he might accompany Crane when the gift was made to O'Dwyer. Accordingly, some days later Crane, after directing Dolan, the Treasurer of the UFA, to withdraw $10,000.00 of the organization's funds from the bank, proceeded with this amount in cash to Gracie Mansion, the official residence of the Mayor of New York.

The trip to the Mayor's residence in uptown New York was made in an automobile owned and driven by another fireman, a friend of Crane's named Wilders. On the way to Gracie Mansion, they stopped to pick up Finkelstein according to their prearrangement. When the group arrived at the mansion, they found that the Mayor was preparing to go down town and, in fact, was on the porch adjusting his coat before getting into the automobile which was waiting for him. Crane and Finkelstein got out of their car and, while Finkelstein stopped to speak to an occupant of the car waiting for the Mayor, Crane went up on the proch where he handed O'Dwyer an envelope containing the $10,000.00 and told him that it represented the support which the firemen had promised. O'Dwyer expressed his thanks, walked back to the door of the mansion and handed the envelope to someone inside. As O'Dwyer came back after delivering the envelope inside the door, Finkelstein came up on the porch and engaged in some conversation with O'Dwyer which Crane did not overhear. Thereafter, Crane, Wilders and Finkelstein got in Wilders' car and returned downtown.

The testimony of Crane is corroborated by Dolan as to the delivery by Dolan to Crane of the $10,000.00 of the UFA funds; and is corroborated by Wilders as to the trip up to Gracie Mansion. There was no evidence as to the disposition of the money after it was handed to some unidentified person inside the house. Although the Mayor's campaign manager, Finkelstein, was present, the money was not then and there delivered to him for use in the campaign. There was no showing that delivery was later made to anyone connected with the campaign or that the money was expended for political purposes.

No evidence was offered to deny, challenge or contradict the testimony of these witnesses. In its opinion, the Tax Court stated:

"Petitioner's counsel subjected the witnesses to a thorough and vigorous cross-examination. We had ample occasion to observe the witnesses and, notwithstanding a few inconsequential inconsistencies in their testimony, we are convinced that they were telling the truth. We are fully satisfied that Crane paid over the $10,000.00 to the petitioner,

584

as set forth in our findings. However, the evidence strongly supports the view that Crane intended the payment as a political or campaign contribution. If it were such and were in fact used for such purposes, then it would not constitute taxable income. On the other hand, if petitioner retained the money or diverted it to his own personal use, it would be taxable income to him. * * *. Petitioner himself was the one person who could throw the most light on this matter. Yet he deliberately chose not to take the witness stand and subject himself to cross-examination. This is a circumstance that cannot be lightly ignored. The burden of proof was upon him, and his failure to meet it calls for the same result that was reached in Manson L. Reichert, supra, 19 T.C. [1027], at p[age]. 1039." (Brackets supplied.)

Taxpayers' counsel contend that Crane's testimony was incredible; that Crane was looting the funds of the UFA; that there were inconsistencies in the testimony of Crane and Wilders; that the Court repeatedly curtailed cross-examination. Counsel were furnished with the prior written statement of Crane which was available to them for purposes of contradiction if his testimony appeared inconsistent with previous statements. There was no evidence to support the broad accusation of looting of funds. The inconsistencies in the testimony of Crane and Wilders were noted as minor by the Tax Court and, in its opinion, the inconsistencies did not destroy the reliability of the testimony offered. The claim of curtailment of cross-examination is a plain misstatement. In fact, in several instances, upon the assurances of counsel that they would follow up to show materiality and pertinency, the Court permitted continued and extended cross-examination far beyond the scope of direct examination and as to matters apparently wholly unrelated to any issue. There was no later showing made and apparently no effort to follow up.

As the trier of facts, the Tax Court observed the witnesses carefully and, upon consideration of their testimony, found that they were truthful. The testimony of the Government witnesses was unrefuted. The facts were within the personal knowledge of William O'Dwyer and he was in a position to refute the testimony if it was untrue. His failure to do so necessarily gives rise to an inference that his testimony would not have been favorable to his own case. Stoumen v. Commissioner, 3 Cir., 1953, 208 F.2d 903. The Tax Court had the opportunity to evaluate the testimony of the witnesses and determine their credibility. We are not prepared to hold that the findings of fact are clearly erroneous as we are not left with the definite and firm conviction that a mistake has been committed. The trial court's findings on questions of fact will not be reversed except for plain error. Hodges v. Standard Oil Co. of New Jersey, 4 Cir., 1941, 123 F.2d 362; Jordan v. Texas Co., 4 Cir., 1941, 123 F.2d 614.

Having traced the money to O'Dwyer to be used for a definite and specific purpose, the burden was then upon O'Dwyer to show that it was so used if he would avoid the inclusion thereof in his taxable income. Implicit in the determination of the Commissioner (that the $10,000.00 was taxable income, based upon substantially the same evidence presented before the Tax Court, and in the face of an absolute denial by taxpayer O'Dwyer of the receipt of the money) is the further finding that the $10,000.00 was *not* used for political or campaign purposes. This determination is presumptively correct and the Tax Court was legally bound by it in the total absence of evidence to rebut the presumption. As the Tax Court said in Manson L. Reichert, supra, "Since petitioner denied receipt of the moneys in the first instance, there is no basis for any conclusion that he turned the money

over to * * *, or anyone else, for use in the campaign * * * ".

## Political Contribution

Taxpayers contend that, even if it be assumed that Crane made a campaign contribution to Mayor O'Dwyer, such gift did not constitute receipt of taxable income under the pertinent provisions of the Revenue Act in force in 1949.[2]

During the tax year 1949, there was in effect Revenue Ruling I. T. 3276, reported in Cum. Bull., 1939–1, Part I, p. 108.[3] This Ruling continued in effect until 1954, when it was purportedly "modified" by Rev. Rul. 54–80, 1954–1, Cum. Bull., p. 11.[4]

Taxpayers argue: That a "political contribution", or a "campaign contribution", was a mere gift and thus excluded from gross income under the then applicable provisions of the income tax laws; that nothing in the statutes, regulations or rulings in effect in 1949 justified the

2. Internal Revenue Code of 1939:
 "§ 22. Gross income.
 "(a) [As amended by Sec. 1, Public Salary Tax Act of 1939, c. 59, 52 Stat. 574] *General Definition.*—'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency, or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *
 "(b) *Exclusions from Gross Income.* The following items shall not be included in gross income and shall be exempt from taxation under this chapter:
 \* \* \* \* \*
 "(3) *Gifts, bequests, devises, and inheritances.* The value of property acquired by gift, bequest, devise, or inheritance. * * *." 26 U.S.C.A. § 22.

3. "Advice is requested whether (1) contributions to political organizations are allowable deductions in the donor's Federal income tax return, and whether (2) political gifts or donations to individuals or to political organizations are subject to Federal Income Tax.

 "With respect to the first inquiry, it is held that contributions to a political organization are not proper deductions in the donor's Federal income tax return, there being no provision in the Revenue Act of 1938 which allows such deductions.
 "With respect to the second inquiry, it is held that a political gift received by an individual or by a political organization is not taxable income to the recipient."

4. "Rev.Rul. 54–80, 1954–1 Cum.Bull. 11:
 "Advice is requested whether that part of the political contributions received by a political organization or an individual seeking political office which is diverted to the personal use of the candidate or other individual constitutes taxable income to such candidate or other individual.
 "Contributions to political organizations are customarily made with the intent and understanding that they be used for the expenses of a political campaign or for some similar purpose. Such contributions are not deductible for Federal income tax purposes by the donor. See I. T. 3276, C.B.1939–1 (Part 1), 108.
 "Where a political gift is received by an individual or a political organization and it is held or used for the purposes intended, i. e., for present or future expenses of a political campaign or for some similar purpose, it is not taxable income to the recipient. See I. T. 3276, *supra.* However, any amount diverted from the channel of campaign activities and used by a candidate or other individual for personal use constitutes taxable income to such candidate or other individual for the year in which the funds are so diverted. For example, a candidate seeking political office receives contributions totaling $1,000 from individuals and organizations for use in his campaign for election to such office. During the campaign the candidate expends $600 of the contributed funds for campaign purposes. He uses the balance of the campaign funds to reduce the mortgage on his personal residence. In such a case the candidate will be required to include in his taxable income the $400 which represents the portion of the fund which he diverted to his personal use. Such amount will be includible in taxable income in the year in which so diverted."
 "I. T. 3276, supra, is modified to the extent that it is inconsistent with the views expressed herein."

treatment, for tax purposes, of a gift or contribution on any different basis merely because of its characterization by the word "political" or the word "campaign"; that there was no duty in 1949 on taxpayers to show the disposition of the campaign contribution; that the 1954 purported modification of Rev. Rul. I. T. 3276 is to the effect that the statutory exclusion of such gift from gross income would only be recognized where the gift is used or held for campaign expenses, and that the only part "diverted" to the personal use of the candidate constitutes taxable income; that the modified ruling of 1954 had no retroactive effect, was contrary to existing 1949 laws and interpretations and was prospective only.

■■■ Section 22(a) of the Internal Revenue Code of 1939 defines gross income in the broadest terms and includes gains, profits and income "derived from any source whatever". That language, as the Supreme Court has stated, was used by Congress in order to exert the full measure of the taxing power. Commissioner of Internal Revenue v. Glenshaw Glass Co., 348 U.S. 426, at page 429, 75 S.Ct. 473, at page 475, 99 L.Ed. 483, and cases cited.

Prior to Rev. Rul. 54–80, the Tax Court had decided Reichert v. Commissioner, 19 T.C. 1027 (March 1953), affirmed on other grounds, 7 Cir., 214 F. 2d 19, certiorari denied 348 U.S. 909, 75 S.Ct. 294, 99 L.Ed. 713. The Tax Court found, as fact, that Reichert received over $1500.00 as contributions to political campaign funds, the receipt of the money having been categorically denied by Reichert. As hereinbefore shown, the Court concluded that there was no basis for any conclusion that Reichert turned the money over to anyone for use in the campaign since he had denied the receipt of the money in the first instance

and the inclusion of the money, so received, in Reichert's unreported income was sustained "for failure of proof".

Earlier, in Paschen v. United States, 7 Cir., 1934, 70 F.2d 491, 500, involving income tax prosecution, there was evidence before the trial court that Paschen had received contributions for political campaign purposes. The trial judge offered the defendant an opportunity to show, if he could, that such contributions were paid out and did not ultimately remain with him, stating that, upon such showing, the contributions would not represent income to Paschen. The Court of Appeals, by inference, indicated approval of the action of the trial court even though the precise point was not presented on appeal.

■■■ We reach the conclusion that Rev. Rul. 54–80 was declaratory of judicial interpretation of existing law and that it supplemented and amplified I. T. 3276, supra, notwithstanding the use of the word "modified". The two rulings are not necessarily inconsistent. I. T. 3276 did not purport to state the result if the recipient of a political contribution diverted it to his personal use; that sequel was supplied by Rev. Rul. 54–80. At the time of the transaction in 1949, taxpayers could not have relied upon any judicial or administrative decision which would justify the belief that the diversion of a political contribution to personal use would not have constituted taxable income.

### Disallowance of Claimed Deductions —Unreimbused Ambassadorial Expenses

William O'Dwyer claimed the right to deduct from gross income, as ordinary and necessary business expenses, or as expenses incurred in the production of income under Sec. 23(a) (1) (A) or (a) (2) of the Internal Revenue Code of 1939,[5] certain expenses claimed to have

5. "§ 23. Deductions from gross income.
"In computing net income there shall be allowed as deductions:
"(a) [as amended by Sec. 121(a), Revenue Act of 1942 c. 619, 56 Stat. 798] Expenses.—

"(1) Trade or business expenses.
"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other

been necessarily incurred in discharge of ambassadorial duties.

For the period August 30 to December 31, 1950, claimed total expenditures amounted to $7,678.63 and for 1951 $28,-390.76. Amounts received during those years as reimbursement from the Department of State for ambassadorial activities in the sums of $542.69 and $10,-124.60 were deducted from these totals, as well as estimated amounts for personal expenses in the sum of $1,000.00 for 1950 and $6,000.00 for 1951. This left a balance claimed by taxpayers, as expenses deductible from income, of $6,-135.94 for 1950 and $12,266.16 for 1951.

The Tax Court found that the evidence submitted to it as to the deductibility of the various expenditures rendered it practically impossible, in many instances, to determine whether a particular expenditure was personal or related to taxpayer's activities as Ambassador. It therefore applied the rule of Cohan v. Commissioner, 2 Cir., 1930, 39 F.2d 540, 544. In that case the Court of Appeals required the Board of Tax Appeals to review total disallowance of claimed deductions for business expenses incurred in travel and entertainment (unsubstantiated by books or records), with directions that the Board should make as close an approximation as possible, "bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making". The Court further said: "It is not fatal that the result will inevitably be speculative; many important decisions must be such".

 The evidence before the Tax Court of expenditures consisted of taxpayers' accountants' work papers for the year 1951 and a stipulation as to expenditures made in 1950. An examination

of these documents shows not only that they are not original records but that they are merely listings of total amounts expended under various categories, such as cigars, cigarettes, wines and liquors, food and household, gifts and medals, telephone and telegraph, flowers, furnishings, entertainment, etc. That taxpayers recognized as personal expenses some of the amounts listed under these various categories is shown by their arbitrary subtraction of estimated amounts of $1,000.00 for 1950 and $6,000.00 for 1951. These estimates made by the accountants, in the absence of testimony or other evidence tending to establish their correctness or to substantiate the claimed expense deductions, could not be binding on the Tax Court. Even though the failure to substantiate would have warranted a disallowance of deductions of any amounts in excess of those recognized by the Commissioner, Burnet v. Houston, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991, in applying the ameliorating rule of the Cohan case, the Tax Court fixed deductible expenses at $2500.00 for 1950 and $18,000.00 for 1951, these amounts being in excess of the amounts allowed by the Commissioner. After deducting therefrom the amounts received as reimbursement, taxpayers were allowed a deduction of $1,957.31 for 1950 and $7,875.50 for 1951.

 The taxpayers cannot complain of the approximation made by the Tax Court under the Cohan rule in the light of their failure to produce necessary supporting evidence establishing rights to deductions. Finley v. Commissioner, 10 Cir., 1958, 255 F.2d 128; Baumgardner v. Commissioner, 9 Cir., 1957, 251 F. 2d 311; see also Harris v. Commissioner, 4 Cir., 1949, 174 F.2d 70. We cannot hold, on the record here presented, that

---

compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * *

　　*　　*　　*　　*　　*

"(2) *Non-trade or non-business expenses.* In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income." 26 U.S.C. 1952 ed., § 23.

these determinations by the Tax Court were clearly erroneous.

### Unexplained Bank Deposit

The evidence before the Tax Court on this point consisted of a ledger sheet of the Chase National Bank of the City of New York showing the deposit of $1500.00 on July 16, 1951, to the credit of a joint account in the name of Sloan O'Dwyer and the name of her mother, the address of both depositors being given as Embassy Residence, Embassy of the United States, Mexico D. F. Mexico; a deposit slip in the individual name of Sloan O'Dwyer dated July 8, 1951, indicating that the amount deposited was evidenced by a check. The fact that the deposit slip was dated eight days before the credit to the account may well indicate that the check and the deposit slip were mailed from Mexico.

Taxpayers argue that an isolated bank deposit, standing alone, is not enough to show the receipt of income and charge that the determination of the Commissioner that the $1500.00 deposit represented taxable income was arbitrary and capricious.

An examination of the ledger sheet discloses another deposit on July 20, 1951, in the amount of $739.97 to the joint account of Sloan O'Dwyer and her mother. There is nothing in the record to indicate the source of either of these deposits but it is significant that the Commissioner found that the $1500.00 only constituted taxable income. It may be that the Commissioner had evidence as to the source and nature of the $739.97 deposit and no evidence whatever as to the source and nature of the $1500.00 deposit. The record is silent on this point.

The Tax Court had no information or evidence before it as to the source or nature of either deposit, but it was confronted with the presumption of correctness attaching to the Commissioner's determination that this particular deposit represented taxable income. The Tax Court stated: "The petitioners have not sustained their burden of overcoming this presumption. They introduced no evidence or testimony. They seemed content to rely upon the fact that the $1500 was deposited in a joint bank account. * * * In the absence of some evidence that the $1500 did not represent taxable income, we must sustain the respondent's determination in this regard."

 All taxpayers had to do in order to overcome the presumption of correctness was to make some reasonable explanation as to the source and nature of the deposit in question. The presumption existed, the Commissioner's determination was prima facie correct and the burden was upon the taxpayers in the Tax Court to overcome this presumption. See Hoefle v. Commissioner, 6 Cir., 1940, 114 F.2d 713.

For the reasons herein stated, the decision of the Tax Court is, in all respects,

Affirmed.