Walter V. Newell v. Commissioner.
Newell v. Commissioner
Docket No. 71267.
United States Tax Court
T.C. Memo 1960-249; 1960 Tax Ct. Memo LEXIS 38; 19 T.C.M. (CCH) 1385; T.C.M. (RIA) 60249; November 25, 1960
*38 Jeremiah W. Davern, Esq., 47 Clinton St., Plattsburgh, N. Y., for the petitioner. Theodore E. Davis, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax and additions to tax as follows: Additions to Tax, I.R.C. 1939
Deficiency
Fraud
Underestimation
Year
in Tax
Sec. 293(b)
Sec. 294(d)(2)
1940
$ 1,592.71
$ 796.36
1941
1,754.76
877.38
1942
10,405.18
5,202.59
1943
1,427.98
713.99
1944
9,113.38
4,556.69
1945
4,680.68
2,340.34
$280.83
1946
1,246.13
623.07
75.72
1947
285.63
142.82
13.99
1948
9,327.32
4,663.66
553.81
1949
731.18
365.59
38.40
1950
6,566.20
3,283.10
435.62
1951
4,628.79
2,314.40
291.39
1952
2,463.79
1,231.90
106.50
The principal issues relate to (1) the correctness of certain items in the net worth statement used by the Commissioner in determining the deficiencies, and (2) his determination of fraud for each of the years. Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. Petitioner, a resident of Plattsburgh, New York, filed income tax *39 returns for the years 1940 through 1952 with the collector of internal revenue for the Albany District of New York. In approximately 1925, petitioner inherited a farm from his father which he has continuously operated until the present time. During the years 1940 to 1952, inclusive, petitioner engaged in the business of buying and selling cattle; it was his practice to maintain approximately 35 to 40 head of cattle on the farm for sale. In 1932, petitioner entered into the business of slaughtering cattle on the farm. During the years in issue, he purchased some cattle specifically for slaughtering, and he butchered as many as five cattle a week. He sold quarters of beef, both wholesale and retail. Most of his sales, however, were wholesale, in amounts of not less than a quarter of beef. During the years 1940 to 1952, petitioner received income from the sale of hides which he cured on the farm. The hides were obtained from the cattle he slaughtered and by purchase from other farmers. Petitioner sold hides in almost every year of the period 1940 through 1952, but in a few of those years, when the market was depressed, he did not sell any hides. He received as much as $15,000 in *40 some years on the sale of hides. During the years 1940 to 1952, inclusive, petitioner received interest on loans made by him which were secured by mortgages upon real estate and chattels. The rate of interest received by him on such loans varied from four to six per cent. Prior to making a loan, petitioner analyzed the credit of the person seeking the loan, and the availability of collateral to secure the loan. Payments upon the loans were made at the office of petitioner's attorney, who maintained records of the payments and the mortgages upon the property serving as collateral. During the years 1940 through 1946, petitioner received rental income from properties located on Pine Street and Bailey Avenue, Plattsburgh, New York. During the years 1940 to 1952, inclusive, petitioner received rental income of approximately $100 a year from property known as the Grange Hall. Petitioner did not report the receipt of any rental income in the income tax returns filed by him for the years 1940 to 1951, inclusive. During the years 1950 to 1952, inclusive, petitioner received dividends upon General Public Utilities stock and Grange League stock, which he did not report in his income tax *41 returns filed for those years. During the years 1946 to 1952, inclusive, petitioner was the Tax Assessor for the Town of Plattsburgh, and he received a salary in the amount of $500 a year therefor, with the exception of the year 1952, for which he received a salary of $400. At the time of the trial, petitioner was the Democratic County Chairman for Clinton County, New York, which position he has held since approximately 1944. While serving as County Chairman, he made political appointments, handled the funds of the organization, made many visits to Albany, New York, when the Legislature was in session and out of session, and went to Chicago for the Democratic National Convention in 1952. During the period that petitioner served as Democratic County Chairman he made "political payments" out of his checking account on behalf of various candidates for public office within his county and for other related purposes in the following amounts: 1947
$ 931.20
1948
674.10
1949
1,389.72
1950
3,924.54
1951
1,687.16
1952
5,857.09 These payments had their source largely in political contributions which had been made to petitioner and which he had deposited in his *42 checking account. However, his disbursements exceeded the contributions. In computing petitioner's income the Commissioner made no allowance for political contributions made to petitioner. Such contributions received by him for each of the years were as follows: 1947
$ 700
1948
500
1949
1,050
1950
3,500
1951
1,300
1952
5,200
Mary O'Connell, secretary to petitioner's attorney, prepared the Federal income tax returns filed by petitioner for the years 1940 to 1951, inclusive. Petitioner's attorney had nothing to do with the preparation of petitioner's income tax returns for the taxable years 1940 to 1952, inclusive. With respect to the income received by petitioner as a so-called cattle dealer for the years 1940 to 1951, inclusive, petitioner gave Mary O'Connell a single gross receipts amount for each of those years. The single gross receipts amount was given to her orally by petitioner for each year. Petitioner never gave Mary O'Connell any paper or written evidence of his taxable income or receipts from the sale of cattle, beef, and hides for the years 1940 to 1951, inclusive. Petitioner never informed her of any income received by him from the sale of *43 hides for the years 1940 to 1951, inclusive. Interest received by petitioner on loans made by him was ascertained by her from the records maintained in the attorney's office in which she was employed. Prior to signing his income tax returns filed for the years 1940 to 1951, inclusive, petitioner examined the returns and the income he reported to Mary O'Connell was reflected in those returns. During the year 1952 petitioner made loans to Donald Renadette and Stanley Newell, in the respective amounts of $500 and $2,500. Petitioner maintained no books of account for any of his income-producing activities during the years 1940 to 1952, inclusive. Records of interest received by petitioner on loans made by him during the years 1940 to 1952 were maintained in the office of petitioner's attorney. Petitioner claimed exemptions for himself and wife and three children in his return for the year 1940; for himself and wife and two children in his returns for the years 1941 through 1946; for himself and wife and one child in his returns for the years 1947 through 1949; and for himself and wife in his returns for the years 1950 through 1952. In determining petitioner's net income by the *44 net worth method for each of the years 1940 through 1952, respondent took into account the following amounts for estimated living expenses: 1940
$3,000.00
1941
3,100.00
1942
3,200.00
1943
3,300.00
1944
$3,400.00
1945
3,500.00
1946
3,600.00
1947
3,700.00
1948
3,800.00
1949
3,900.00
1950
4,000.00
1951
4,100.00
1952
4,200.00 A substantial part of the food consumed by petitioner and members of his family during these years came from his farm. This included meat, vegetables, butter, milk, cream and eggs. Respondent did not include in his estimate of petitioner's living expenses food obtained from the farm which was consumed by petitioner and members of his family. In making his estimate he took into account the number of persons in petitioner's family during each of the taxable years, and estimated the amount the head of such a family had to expend for the necessities of life such as electricity, clothing, etc. Certain agreements made in the stipulation of facts require revision of the net worth statement originally used by the Commissioner. The net income of petitioner as originally computed by the Commissioner, using the net worth method in determining *45 the deficiencies, the net income so determined as revised to give effect to the stipulation of facts, and the net income reported by petitioner for each of the taxable years, were as follows: Net Income per
Net Income
Net Worth
per Net Worth
Net Income
Year
Statement
Statement as Revised
Reported
1940
$15,929.05
$15,904.15
$2,733.29
1941
12,550.63
6,525.63
2,665.96
1942
27,875.72
27,720.72
2,653.71
1943
8,318.23
8,423.23
2,893.41
1944
24,517.18
24,492.18
3,135.55
1945
16,523.44
16,498.44
3,134.95
1946
8,947.33
8,922.33
3,662.42
1947
4,328.82
4,303.82
2,908.34
1948
27,981.40
27,981.40
3,022.00
1949
6,546.85
6,546.85
2,757.24
1950
23,004.80
22,874.80
6,027.25
1951
17,514.68
17,214.68
5,232.75
1952
9,934.08
9,934.08
1,615.22
Petitioner has agreed to all the items or groups of items in the net worth statement as revised except two loans receivable aggregating $3,000 as of December 31, 1952, the estimated annual living expenses for the entire period 1940-1952, and "political payments" for each of the years 1947-1952. Except for the "political payments", which must be revised in accordance with the *46 findings made above, the remaining items in the net worth statement contested by petitioner (namely, the two loans receivable aggregating $3,000 as of December 31, 1952, and the estimated annual living expenses for each of the years in controversy) are correct. Part of the deficiency for each of the years 1940 to 1951, inclusive, was due to fraud with intent to evade tax, and the return for each of those years was false and fraudulent with intent to evade tax. Opinion RAUM, Judge: The Commissioner determined petitioner's income by the net worth method with appropriate adjustments for nondeductible expenditures, capital gains and losses, and the like. [1] The parties have agreed to certain changes in the net worth statement and have stipulated that as thus revised the statement is correct except for the following items: two loans receivable aggregating $3,000 as of December 31, 1952, living expenses for petitioner and his family for each of the years (determined by respondent to be $3,000 for 1940, and a $100 increase for each year, up to $4,200 for 1952), and "political payments" made by petitioner for each of the years 1947-1952. Thus, these items, as to which the parties were *47 unable to stipulate, are the only ones here in controversy, and our findings have disposed of all of them. As to the two loans aggregating $3,000, the evidence shows and petitioner does not disagree that he in fact made two such loans during 1952. However, he contends that they were paid off shortly after they were made and were not outstanding as of December 31, 1952. There is no convincing evidence to support that contention and we were therefore compelled to make our finding against petitioner in connection with these loans for failure of proof. The amounts charged to petitioner for living expenses were based upon estimates as of course they must be. The evidence satisfies us that petitioner's actual living expenses were not less than these estimates, that the estimates were reasonable, *48 that they did not include amounts for food produced at petitioner's farm which he and his family consumed, and we therefore found them to be correct. If anything, the estimates, particularly for the earlier years, appear to us to be on the low side. The evidence as to "political payments" convinces us that the amounts charged to petitioner must be revised downward. The amounts paid out by petitioner for political purposes had their source in large part in political contributions that had been made to him. The Commissioner did not give him any credit for such contributions. Although there are no records or other evidence before us as to the specific amounts of those contributions, we must do the best we can with the materials at hand, cf. Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2), and we have accordingly used our best judgment in the circumstances and have made findings of fact setting forth the amounts of political contributions received by petitioner which must be offset against his political payments. Cf. Michael Potson, 22 T.C. 912, 929, affirmed sub nom., Bodoglau v. Commissioner, 230 F. 2d 336, 340 (C.A. 7); David Pleason, 22 T.C. 361, 371, *49 affirmed, 226 F. 2d 732, 734 (C.A. 7), certiorari denied, 350 U.S. 1006. The effect of these findings is to reduce the amounts of taxable income for each of the years 1947-1952. [2]
Our findings, as summarized above, dispose of all questions relating to the amount of petitioner's taxable income for each of the years. Several other issues remain for disposition. Petitioner challenges the Commissioner's statutory addition to tax for fraud. We think that the evidence amply supports the Commissioner's determination in this respect for each year, except 1952 which will be discussed separately. Although petitioner is a person of but little formal education he impressed us as being shrewd and intelligent. He conducted his affairs in such manner as to defy any successful investigation of his profits from sales of cattle, beef and hides. Yet the evidence convincingly shows substantial amounts of income *50 received over a long period of years that were unreported. We cannot believe in the circumstances revealed by this record that failure to report such income was due to honest mistake, and are satisfied that it was due to fraud with intent to evade tax. Accordingly, we have found that part of the deficiency for each of the years 1940-1951 was due to fraud with intent to evade tax. A different result is called for in respect of 1952. The amount of unreported income for 1952 according to the Commissioner's net worth statement was $8,318.86. However, as a result of our findings relating to political payments, this amount must be reduced by $5,200, leaving unreported income of $3,118.86. But one component in the latter figure is the contested $3,000 in loans which petitioner claims were not outstanding as of December 31, 1952. While it is true that we resolved that controversy against petitioner for failure of proof, such failure of proof cannot be part of the clear and convincing evidence that is required in order to establish fraud. Accordingly, the elimination of this item shows that the Commissioner has affirmatively proved unreported income only in the amount of $118.86 for the year *51 1952, and in the circumstances of this case we cannot find that he has established the necessary fraud for that year. No evidence was presented by petitioner to sustain his burden of proving that he is not liable for additions to tax under Section 294(d)(2) of the Internal Revenue Code of 1939 determined by respondent for the years 1945 through 1952 for substantial underestimate of estimated tax for those years, and on brief he makes no argument with respect to this issue. This issue is therefore decided in favor of respondent. In his brief petitioner contends "that the statute of limitations had run against all of the years 1940 to 1952 inclusive unless waiver had been signed by petitioner". No issue with respect to the statute of limitations is raised by the pleadings and no mention was made of such issue at the trial. "Orderly procedure requires that the issues be clearly framed in the pleadings [so] that both parties may have notice and an opportunity to produce their evidence." United Business Corporation of America, 19 B.T.A. 809, 831, affirmed (without discussion of this point), 62 F. 2d 754 (C.A. 2), certiorari denied, 290 U.S. 635. *52 "Where a taxpayer fails to rely upon the statute of limitations in his pleadings or does not otherwise attempt to bring it into the case as an issue until after trial and submission by the parties, the Tax Court may ordinarily regard the question as having legally been waived by him and refuse to consider it." Given v. Commissioner, 238 F. 2d 579, 583 (C.A. 8), affirming a Memorandum Opinion of this Court. We hold that petitioner's attempt to raise the statute of limitations as an issue on brief comes too late and that the statute is not available to him as a defense to assessment and collection of the deficiencies. Moreover, except for 1952, fraud has been established against which the plea of the statute of limitations cannot prevail. Decision will be entered under Rule 50. Footnotes
1. Petitioner challenged the authority of the Commissioner to resort to the net worth method. The point is without substance. Holland v. United States, 348 U.S. 121, 130-132; Morris Lipsitz, 21 T.C. 917, 931, affirmed, 220 F. 2d 871 (C.A. 4), certiorari denied, 350 U.S. 845; Estate of George L. Cury, 23 T.C. 305, 333-334↩.
2. No question is raised here as to whether the political contributions themselves may have constituted taxable income. Cf. William O'Dwyer, 28 T.C. 698, affirmed, 266 F. 2d 575 (C.A. 4), certiorari denied, 361 U.S. 862↩.