**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 15-2192**

─────────────

QINETIQ US HOLDINGS, INC. & SUBSIDIARIES,

Petitioner - Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee.

─────────────

Appeal from the United States Tax Court.
(Tax Ct. No. 14122-13)

─────────────

Argued: October 26, 2016          Decided: January 6, 2017

─────────────

Before KING, KEENAN, and DIAZ, Circuit Judges.

─────────────

Affirmed by published opinion. Judge Keenan wrote the opinion, in which Judge King and Judge Diaz joined.

─────────────

**ARGUED:** Gregory G. Garre, LATHAM & WATKINS LLP, Washington, D.C., for Appellant. Ellen Page DelSole, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Gerald A. Kafka, Benjamin W. Snyder, Nicolle Nonken Gibbs, LATHAM & WATKINS LLP, Washington, D.C., for Appellant. Caroline D. Ciraolo, Acting Assistant Attorney General, Diana L. Erbsen, Deputy Assistant Attorney General, Gilbert S. Rothenberg, Teresa E. McLaughlin, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

─────────────

BARBARA MILANO KEENAN, Circuit Judge:

This appeal from a decision of the United States Tax Court (the tax court) involves the federal income tax treatment of shares of stock issued to an executive employee of Dominion Technology Resources, Inc. (DTRI), around the time of DTRI's founding. The company's successor in interest, QinetiQ U.S. Holdings, Inc. & Subsidiaries (QinetiQ), contends that the stock was issued in connection with the executive's employment and was subject to a substantial risk of forfeiture until 2008. On this basis, QinetiQ argues that it is entitled to a tax deduction for the value of the stock as a trade or business expense in the tax year ending March 31, 2009.

After reviewing QinetiQ's tax return, the Internal Revenue Service (IRS) issued a Notice of Deficiency concluding that QinetiQ had not shown its entitlement to the claimed deduction. QinetiQ later filed suit in the tax court, raising both a procedural and a substantive argument. QinetiQ argued that the IRS failed to give a reasoned explanation in the Notice of Deficiency for denying the tax deduction. QinetiQ also argued that the stock qualified as a deductible trade or business expense in tax year 2008, because the stock was issued in connection with services and was subject to a substantial risk of forfeiture until that year. The tax court rejected the procedural argument, holding that the Notice of Deficiency

2

provided sufficient explanation.  The tax court also held that QinetiQ failed to show that the stock was issued in connection with services and was subject to a substantial risk of forfeiture.  Accordingly, the tax court entered judgment in favor of the IRS.

Upon our review, we conclude that the IRS complied with all applicable procedural requirements in issuing the Notice of Deficiency to QinetiQ.  We further hold that the tax court did not err in concluding that the stock failed to qualify as a deductible expense for the tax year ending March 31, 2009, because the stock was not issued subject to a substantial risk of forfeiture.  We therefore affirm the tax court's judgment.

I.

In March 2002, Thomas G. Hume (Hume) formed "Thomas G. Hume, Inc." as a corporation organized under the laws of Virginia.  Hume was the sole shareholder, and served with his wife, Karyn Hume, as the initial directors of the corporation. Hume filed federal tax forms electing for the corporation to be treated as an "S corporation," in order to permit the corporation's profits and losses to be passed through to him individually.  See 26 U.S.C. § 1366(b).  Thomas G. Hume, Inc. appears not to have engaged in any business before November 2002.

In November 2002, Hume and Julian Chin took certain actions to facilitate Chin's joining the business enterprise. On December 6, 2002, Hume and Karyn Hume, as directors, filed articles of amendment with the Commonwealth of Virginia changing the name of the corporation to Dominion Technology Resources, Inc. and creating two classes of shares, class A voting stock and class B nonvoting stock. The next day, Karyn Hume resigned from DTRI's board of directors, leaving Hume as the sole director. On December 9, 2002, Hume paid a par value[1] of $450 in exchange for 4,500 shares of DTRI class A voting stock, and Chin paid the same par value in exchange for 4,455 shares of DTRI class A voting stock and 45 shares of DTRI class B nonvoting stock.

On December 12, 2002, Hume executed a "Consent in Lieu of the Organizational Meeting of the Board of Directors of [DTRI]" (December Consent), which offered for sale and issuance 4,500 shares of class A stock to Hume, and 4,455 shares of class A and 45 shares of class B stock to Chin. Attached to the December Consent were letters signed by Hume and Chin acknowledging their intent to subscribe to the stated stock shares. Also included in the December Consent was authorization for DTRI to enter into

---

[1] Par value is an "arbitrary dollar amount assigned to a stock share by the corporate charter." Par Value, Black's Law Dictionary 1298 (10th ed. 2014).

4

a Shareholders Agreement and employment agreements with Hume and Chin. In a separate paragraph, the December Consent further authorized DTRI to enter into individual employment agreements and restrictive stock agreements with other employees.

The Shareholders Agreement entered into by DTRI, Hume, and Chin stated that the parties

> believe that it is in their mutual best interest to make provisions for the future disposition of all of the shares of common stock of the Corporation to the end that continuity of harmonious management is assured, and a fair process is established by which said shares of common stock may be transferred, conveyed, assigned or sold[.]

To that end, the Shareholders Agreement prescribed provisions for restricting the sale or transfer of stock and for returning stock to the corporation in the event of either Hume's or Chin's death, disability, or termination of employment with DTRI.

The Shareholders Agreement contained provisions for calculating the "Agreement Value" of the shares upon the occurrence of any of these events, and gave the corporation the option of repurchasing Hume's or Chin's shares at the calculated value in the event of such death, disability, or termination without cause. Additionally, in the event of voluntary resignation by the employee, the Shareholders Agreement provided DTRI the option of purchasing the shares at 5% of the Agreement Value for every year of the departing employee's employment, up to a maximum of 100% after twenty years. However, in the event

5

that the employee voluntarily resigned and engaged in competition with DTRI, or that DTRI terminated the employee for cause, the corporation would have the option to purchase the shares at 5% of the Agreement Value for every year of employment, up to a maximum of 25% of the Agreement Value.

Also in December 2002, DTRI entered into stock agreements with other employees that were far more restrictive than the terms of the Shareholders Agreement executed by Hume and Chin. The stock agreements with the other employees contained greater limitations on the transfer of stock and a less generous method for calculating stock value for purposes of DTRI's repurchase of a departing employee's stock. Also, unlike Hume and Chin, the other employees did not receive any voting rights in the stock they received.

DTRI entered into employment agreements with Hume, Chin, and other employees in December 2002. The employment agreements with Hume and Chin bore no reference to stock issued as compensation. In contrast, the employment agreements for the other employees who received stock in December 2002 explicitly referenced, under a contract section labeled "Compensation," nonvoting stock that was issued subject to restrictions.

DTRI, Hume, and Chin filed yearly tax documents treating DTRI as a pass-through entity between tax years 2002 and 2006, with Hume and Chin identified as the shareholders. In DTRI's

6

tax filings from 2002 to 2006, DTRI allocated its net income or loss to Hume and Chin, based on their respective percentage of stock ownership in DTRI in each taxable year. In December 2006, DTRI revoked its S corporation election, effective January 1, 2007. From 2002 through 2007, DTRI did not report the stock issued in 2002 to Hume and Chin as employment compensation, and therefore did not withhold federal payroll taxes on the issued stock. In contrast, DTRI, Hume, and Chin reported as employment compensation shares later granted to Hume and Chin.

In 2008, QinetiQ entered into negotiations to purchase DTRI. On August 4, 2008, QinetiQ, Project Black Acquisition Corp., DTRI, Hume, and Chin entered into a final agreement and plan of merger, with QinetiQ paying $123 million in exchange for all outstanding stock in DTRI. Immediately before the transaction closed, Hume and Chin executed consent agreements waiving DTRI's rights with respect to stock transfer restrictions or partially vested stock. The merger transaction closed in October 2008.

For the tax year ending on March 31, 2009, QinetiQ withheld payroll taxes in accordance with the value of the stock received by Hume and Chin in 2002, and claimed deductions under 26 U.S.C. § 83(h), as wages paid to Hume and Chin for the fair market value of the shares originally issued to them in December 2002. Hume and Chin filed personal income tax returns for tax year

7

2008 claiming as wage income the 2008 value of their respective shares issued in December 2002.

The IRS transmitted to QinetiQ a Notice of Deficiency stating that the IRS had determined that QinetiQ "ha[d] not established that [it was] entitled" to a deduction "under the provisions of [26 U.S.C.] § 83," and that QinetiQ's taxable income for the year thereby was increased by "$117,777,501." The IRS did not give a further explanation of its decision in its Notice of Deficiency.

QinetiQ filed a petition in the tax court challenging the sufficiency of the Notice of Deficiency, as well as the IRS's substantive determination with respect to Chin's shares.[2] The tax court ruled that QinetiQ had not demonstrated entitlement to the deduction on two independent bases, namely, that the stock was not property "transferred in connection with the performance of services" and was not "subject to a substantial risk of forfeiture" at the time Chin acquired the shares. QinetiQ appeals from the tax court's judgment.

---

[2] Originally, QinetiQ challenged the classification of the shares issued to both Hume and Chin but, during the pendency of the tax court case, QinetiQ conceded that the stock shares issued to Hume did not qualify as Section 83 property.

8

We first address QinetiQ's argument that the Notice of Deficiency is invalid because it failed to provide a reasoned explanation for the agency's final decision, as required by the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06. This issue presents a question of law that we consider de novo. Starnes v. Comm'r, 680 F.3d 417, 425 (4th Cir. 2012).

A.

The APA authorizes district courts to review agency actions with a "focal point" on the "administrative record already in existence." Camp v. Pitts, 411 U.S. 138, 142 (1973) (per curiam). The Supreme Court has held that a required component of this administrative record is a "reasoned explanation for [the agency] action." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515–16 (2009). QinetiQ anchors its argument on this principle, maintaining that this requirement of a reasoned explanation necessarily applies to a Notice of Deficiency, because that notice is a final agency action within the meaning of the APA. Thus, according to QinetiQ, failure by the IRS to comply with this APA requirement rendered the Notice of Deficiency invalid.

We disagree with QinetiQ's argument, which fails to consider the unique system of judicial review provided by the Internal Revenue Code for adjudication of the merits of a Notice

of Deficiency. It is that specific body of law, rather than the more general provisions for judicial review authorized by the APA, that governs the content requirements of a Notice of Deficiency.

Under the APA, the "task of the reviewing court is to apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985) (internal citation omitted). The reviewing court in such a case generally is not authorized to conduct a de novo evaluation of the record or to "reach its own conclusions" regarding the subject matter before the agency. Id. at 744.

Some agency-specific statutes, however, provide materially different procedures for judicial review that predate the APA's enactment. One such example is the Internal Revenue Code (the Code), which authorizes de novo review in the tax court of a Notice of Deficiency. See 26 U.S.C. § 6214; Eren v. Comm'r, 180 F.3d 594, 597 (4th Cir. 1999). We discussed this unique system of judicial review in our decision in O'Dwyer v. Commissioner, 266 F.2d 575 (4th Cir. 1959). We explained that because the Code's provisions for de novo review in the tax court permit consideration of new evidence and new issues not presented at the agency level, those provisions are incompatible with the

10

limited judicial review of final agency actions allowed under the APA.[3]  Id. at 580; see also 26 U.S.C. § 6214(a).

Additionally, we observe that for an agency action to be deemed "final" within the meaning of the APA and, thus, subject to the APA's requirement of a reasoned explanation, the agency "action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 178 (1997) (internal citation and quotation marks omitted).  "[L]egal consequences" include agency determinations that restrict the government's power to take contrary litigation positions in subsequent proceedings. See U.S. Army Corps of Eng'rs. v. Hawkes Co., 136 S. Ct. 1807, 1814 (2016) (holding that agency determinations effectively giving a five-year "safe harbor" from government suits create "legal consequences" within the meaning of the Bennett test).

---

[3] QinetiQ argues that this Court's opinion in O'Dwyer no longer is "good law" because O'Dwyer relied on an outmoded line of reasoning that the APA's procedures for judicial review apply only to formal adjudications, to the exclusion of informal agency actions.  Although the APA's judicial review procedures have since been held to apply to informal agency actions, as well as to formal adjudications, see Fla. Power & Light Co., 470 U.S. at 744, we observe that the central holding of O'Dwyer remains valid, namely, that the de novo review procedures provided by the Internal Revenue Code, rather than the judicial review procedures under the APA, govern judicial review of deficiency proceedings.

11

After issuing a Notice of Deficiency, however, the IRS may later assert in the tax court new legal theories and allege additional deficiencies. See 26 U.S.C. § 6214(a); Tax Ct. R. 142(a)(1). Likewise, a taxpayer may raise new matters before the tax court not previously considered during the administrative process. 26 U.S.C. § 6214(a). In contrast to these fluid procedures, the APA's "arbitrary" and "capricious" standard requires that judicial review of an agency action be confined to the static administrative record with deference accorded to the agency's decision, and that the agency action be final in all respects before judicial review commences. See 5 U.S.C. §§ 704, 706(2)(A); Pitts, 411 U.S. at 142.

Given these significant variations in the scope of judicial review under the two statutory schemes, we conclude that the APA's general procedures for judicial review, including the requirement of a reasoned explanation in a final agency decision, were not intended by Congress to be superimposed on the Internal Revenue Code's specific procedures for de novo judicial review of the merits of a Notice of Deficiency. As the Supreme Court has emphasized, Congress did not intend for the APA "to duplicate the previously established special statutory procedures relating to specific agencies." Bowen v. Massachusetts, 487 U.S. 879, 903 (1988); see also Hinck v. United States, 550 U.S. 501, 506 (2007) ("[I]n most contexts, a

12

precisely drawn, detailed statute pre-empts more general remedies.") (internal citation and quotation marks omitted). Accordingly, we hold that the APA's requirement of a reasoned explanation in support of a final agency action does not apply to a Notice of Deficiency issued by the IRS and that, therefore, the Notice of Deficiency issued to QinetiQ in this case was not subject to that APA requirement.[4]

## B.

We next consider whether the Notice of Deficiency in this case was insufficient to satisfy the requirement of Section 7522(a) of the Code that the IRS "describe [in the Notice] the basis for, and identify the amounts (if any) of, the tax due, interest, additional amounts, additions to the tax, and assessable penalties." 26 U.S.C. § 7522(a). The statute further provides that "an inadequate description under the preceding sentence shall not invalidate such notice." Id. However, the statute is silent regarding the circumstances, if any, that will cause a Notice of Deficiency to be invalidated. Id.

---

[4] We acknowledge that the APA anticipates that "de novo" determination of facts by the reviewing court may sometimes be appropriate. 5 U.S.C. § 706(2)(F). However, this is not such a case, because application of the APA would simply "duplicate the previously established special statutory procedures" of the Internal Revenue Code. Bowen, 487 U.S. at 903.

13

Some federal courts of appeal have held that a Notice of Deficiency may be invalidated for the failure to include certain information. For example, before the 1988 enactment of Section 7522,[5] we held that a Notice of Deficiency must contain a statement that the IRS has examined a return and has determined a deficiency in an "exact amount." Abrams v. Comm'r, 787 F.2d 939, 941 (4th Cir. 1986). And, after the enactment of Section 7522, the Ninth Circuit implicitly has endorsed application of a rule that major errors in a Notice of Deficiency causing prejudice to a taxpayer will render that determination invalid. See Elings v. Comm'r, 324 F.3d 1110, 1113 (9th Cir. 2003). Also, the Tenth Circuit has held that a Notice of Deficiency may not be used to implicitly deny without explanation a taxpayer's request for discretionary relief.[6] See Fisher v. Comm'r, 45 F.3d

---

[5] The language now codified at 26 U.S.C. § 7522 was originally codified at Section 7521 in 1988 and renumbered as Section 7522 in 1990. See Omnibus Taxpayer Bill of Rights, Pub. L. No. 100-647, § 6233, 102 Stat. 3342, 3735 (1988); Revenue Reconciliation Act of 1990, Pub. L. No. 101-508, § 11704, 104 Stat. 1388, 1388-519 (1990).

[6] We do not read Fisher, as QinetiQ urges, as requiring a reasoned explanation in all Notices of Deficiency. The court in Fisher was asked to review the Commissioner's implicit denial, through inaction, of a discretionary waiver of a tax penalty. See Fisher, 45 F.3d at 396–97 (citing 26 U.S.C. § 6661(c)). The court in Fisher held that without an explicit agency ruling to review, the tax court "had no basis for determining what reasons the Commissioner may have relied upon," and that, therefore, the Commissioner "failed to demonstrate that she had exercised her discretion." Id. at 397. The rationale of Fisher thus applies
(Continued)

14

396, 397 (10th Cir. 1995). In contrast, some of our sister circuits have held that minor, nonprejudicial flaws in a Notice of Deficiency will not cause such notice to be invalidated. Elings, 324 F.3d at 1113; Smith v. Comm'r, 275 F.3d 912, 915 & n.2 (10th Cir. 2001).

Upon consideration of this authority, we hold that the Notice of Deficiency issued to QinetiQ satisfied the basic requirements of the Internal Revenue Code. The Notice of Deficiency informed QinetiQ that the IRS had determined a deficiency in an exact amount for a particular tax year, and incorporated by reference an enclosed statement that "the deduction you claimed for Salaries and Wages in the amount of $117,777,501 under the provisions of [Code] § 83 is disallowed in full as you have not established that you are entitled to such a deduction." The Notice of Deficiency further informed QinetiQ that it had the right to contest this deficiency determination in the tax court. In light of the taxpayer's burden to show entitlement to a particular deduction, INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84 (1992), we discern no prejudice to QinetiQ due to the absence of additional information in the

---

only to cases in which courts review agency action for abuse of discretion, rather than cases in which the tax court applies a de novo standard of review. See id.

Notice of Deficiency.  Accordingly, we hold that its content was sufficient to satisfy the requirements of the Internal Revenue Code.

## III.

Finally, we turn to the merits of QinetiQ's claim that QinetiQ was entitled to a tax deduction in tax year 2008 for the stock Chin acquired from DTRI in 2002.  In addressing this issue, we apply an established standard of review.  Decisions of the tax court are subject on appeal to the same standard we apply to civil bench trials on appeal from the district courts. Estate of Waters v. Comm'r, 48 F.3d 838, 841–42 (4th Cir. 1995). Under this standard, we review factual findings for clear error, legal questions de novo, and mixed questions of law and fact de novo.  Waterman v. Comm'r, 179 F.3d 123, 126 (4th Cir. 1999); Waters, 48 F.3d at 842.

QinetiQ argues that the stock Chin acquired from DTRI in 2002 qualified as a trade or business expense in 2008, because the stock was transferred "in connection with" Chin's employment with DTRI, and was "subject to a substantial risk of forfeiture" until Chin sold the shares in 2008 as part of DTRI's merger with QinetiQ.   See 26 U.S.C. §§ 83(h), 162.  The IRS responds that the tax court properly rejected QinetiQ's claim because the evidence showed that Chin subscribed to the stock for

16

investment, rather than in connection with his employment with DTRI, and that the stock was not issued subject to a substantial risk of forfeiture.

We agree with the IRS that the tax court did not err in rejecting QinetiQ's claimed deduction. Section 83(a) of the Code, in relevant part, generally treats property transferred "in connection with the performance of services" as "gross income of the person who performed such services." 26 U.S.C. § 83(a). Because a transfer of this nature is treated as gross income of the individual providing such services, the employer ordinarily is entitled to a deduction for the equivalent value as a trade or business expense. 26 U.S.C. §§ 83(h), 162(a).

This rule is modified, however, when property transferred "in connection with the performance of services" is "subject to a substantial risk of forfeiture." 26 U.S.C. § 83(a). Property transferred under such circumstances is not treated as gross income of the individual providing services until the first taxable year in which the property was no longer subject to a substantial risk of forfeiture. Id. Therefore, an employer seeking to establish entitlement to a deduction for property transferred to an employee in a prior tax year must show both: (1) that the property was transferred "in connection with the performance of services"; and (2) that the property was "subject to a substantial risk of forfeiture" from the time the property

17

was transferred until the tax year for which the deduction is claimed. Id.; see also Strom v. United States, 641 F.3d 1051, 1055–56 (9th Cir. 2011); United States v. Bergbauer, 602 F.3d 569, 580 (4th Cir. 2010). Thus, if the employer fails to establish either of these two required elements, the employer is not entitled to claim the property transferred in an earlier tax year as a trade or business expense. See 26 U.S.C. §§ 83(a), 83(h), 162(a).

In the present case, the tax court found that QinetiQ had failed to prove either requirement for establishing its claimed deduction. We conclude that the record supports the tax court's determination that the stock transferred to Chin in 2002 was not issued subject to a substantial risk of forfeiture. Because this factor is a required element of proof for establishing entitlement to the claimed deduction in the tax year in dispute, we limit our analysis to this single element and do not address the other statutorily required element that the stock have been transferred in connection with the performance of services.

Under Treasury regulations implementing Section 83(a), the term "substantial risk of forfeiture" is applied in the context of the "facts and circumstances" of each individual case. 26 C.F.R. § 1.83-3(c)(1). The relevant regulation further clarifies that property is not "subject to a substantial risk of forfeiture to the extent that the employer is required to pay

18

the fair market value of such property to the employee upon the return of such property." Id. In addition, property is not subject to a substantial risk of forfeiture if "at the time of the transfer the facts and circumstances demonstrate that the forfeiture condition is unlikely to be enforced." Id. § 1.83-3(c)(1), (3). Likewise, conditions imposed at the time of transfer that require the return of property "if the employee is discharged for cause or for committing a crime," or "if the employee accepts a job with a competing firm," will not be sufficient to constitute a substantial risk of forfeiture. Id. § 1.83-3(c)(2).

Here, the terms of the Shareholders Agreement between DTRI, Hume, and Chin recited certain conditions that would require Chin to return the stock to DTRI. In the event of Chin's death, disability, or termination without cause, the Shareholders Agreement provided a formula for DTRI to repurchase Chin's stock that corresponded with "one hundred percent (100%) [of] the Agreement Value."[7] Given this requirement of fair market value, the repurchase of Chin's stock under those circumstances would

---

[7] The Shareholders Agreement prescribed an objective method for calculating the value of the corporation, based on four times the earnings of the corporation in the fiscal year immediately preceding the event requiring valuation. Nothing in the record indicates that this formula would not result in the fair market value of the stock.

not be considered a "forfeiture" within the meaning of the relevant regulation. 26 C.F.R. § 1.83-3(c)(1).

In the event of Chin's voluntary resignation, the Shareholders Agreement would have provided for DTRI to repurchase the stock at "five percent (5%) [of the Agreement Value] for every full year of service" by Chin, up to the full Agreement Value after 20 years of service. However, if Chin were terminated for cause or voluntarily resigned and engaged in competition with DTRI, the stock repurchase price would be 5% of the Agreement Value for each year of service, up to a maximum of 25% of the Agreement Value.

Read together, these additional provisions of the Shareholders Agreement indicate that the only circumstances in which Chin would be required to forfeit his stock at a below-market price would be if Chin voluntarily resigned before 20 years of employment, if Chin voluntarily resigned and entered into competition with DTRI, or if Chin were terminated for cause. Because the regulation provides that forfeiture provisions triggered by termination for cause or by engaging in competition do not constitute a "substantial risk of forfeiture," 26 C.F.R. § 1.83-3(c)(2), the only remaining ground for forfeiture would be the circumstance of Chin's voluntary resignation.

20

With respect to this sole remaining ground for forfeiture, the tax court concluded that the likelihood of forfeiture due to Chin's voluntary resignation did not amount to a "substantial risk." The tax court made a factual determination that Hume would have been unlikely to enforce the shareholder restrictions on the stock in the event of Chin's voluntary departure. In concluding that Chin's stock was not subject to a substantial risk of forfeiture but was intended to be treated as "fully vested and outstanding stock" without restrictions, the tax court cited Chin's role as an initial investor in DTRI, Chin's "very close work relationship" with Hume, and Chin's "vital role within DTRI as the executive vice president, COO, and a 49.75% shareholder in voting stock."

Based on our review, we conclude that the tax court's factual conclusion, that Chin's significant ownership position in DTRI and his strong relationship with Hume demonstrated that the stock was not transferred in 2002 subject to a "substantial risk of forfeiture," is not clearly erroneous and was supported by the record. We therefore hold that the tax court did not err in concluding that QinetiQ failed to establish its entitlement to the claimed deduction.

IV.

For these reasons, we affirm the tax court's judgment.

AFFIRMED