T.C. Memo. 2019-78

UNITED STATES TAX COURT

HECTOR BACA AND MAGDALENA BACA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11459-15.                    Filed June 26, 2019.

<u>Joel Cruz-Esparza</u>, for petitioners.

<u>Maria Cerina De Ramos</u>, <u>Brock E. Whalen</u>, and <u>Melinda K. Fisher</u>, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Hector Baca is always on the lookout for new ways to

make money for his family.  If he hears about a new piece of equipment he can

learn to use, he'll buy it and build a business around it; if he learns that someone

[*2] needs something done, he'll extend his business to grab the opportunity; if he can qualify for high-paying temporary work, he'll take the job.

But his bookkeeping for all this work did not always meet the standard of meticulousness the IRS prefers. The Commissioner has disallowed for lack of substantiation a large number of deductions the Bacas claimed on their 2012 and 2013 returns, and he also says they owe a section 6651(a)(1)[1] late-filing addition to tax and section 6662(a) penalties.

## FINDINGS OF FACT

The Bacas are immigrants from Mexico who have grown roots in El Paso, Texas. In 1997 Hector Baca started working as a dispatcher for a small local company and went on to buy it just a few years later. What began as a delivery company sprouted multiple other businesses, all of which Baca ran from the El Paso home he owned with his wife Magdalena. She herself had risen to become a vice president of WestStar Bank. Her income was mostly wages from the bank, though she helped her husband with a multilevel marketing business.

It was Hector Baca's tangle of businesses that drew the Commissioner's attention, and we start by describing them.

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

**[*3]** I.     <u>Hector Baca's Businesses and Employment</u>

*Dependable Transportation Services (DTS).*  DTS is a limited liability company (LLC) through which Baca sold delivery services.  Baca referred to DTS's services as "hot shots" or "urgent deliveries," but business cooled by 2012 and DTS was down to one client before it ceased business by the year's end.

*Chile Relabeling Business.*  This was perhaps the most unusual and short-term of Baca's businesses--it lasted for only ten months in 2012.  It came to life when one of DTS's clients, Farzin Tabatabai, bought a large number of chile bags that he wanted to relabel with the name of his own company.  He hired Baca to do the job, and Baca simply tacked the relabeling onto the delivery services he was already performing for Tabatabai.  And so a chile-bag relabeling business became a part of DTS.

Baca would relabel the chile bags and then fax invoices to Tabatabai for payment, which earned him a total of $9,196 in 2012.  Baca claims, however, that he hired Jay ("Pancho") Merced as a contract laborer to perform these services. The arrangement was not perhaps the most formal, and Baca claimed that he paid Merced by letting him use a DTS debit card from Wells Fargo to withdraw "about $9,000" in cash from DTS's account.  There is nothing in the record to confirm

**[*4]** that these withdrawals occurred, or that DTS or Baca made any other payment to anyone named "Merced" or "Pancho" for this work.

*Mobile 18-Wheeler Service.* Baca also spotted an opportunity to do mobile oil changes for 18-wheelers in the El Paso area. He added general tuneups to his service, and offered it directly to drivers. To make this possible, he had to purchase a good deal of equipment, including a GMC van,[2] compressors (or car lifts), a pump for oil and grease, and "everything to give service in 18-wheelers." This equipment wasn't cheap, and Baca says he spent around $15,000[3] to "complete * * * the van" with everything necessary to perform the tuneups and oil changes. We aren't sure whether Baca is operating this service as a sole proprietorship or within a more formal business structure.

*Multilevel Marketing Company.* We also don't have much information on Baca's involvement in what he claims is a "multilevel" business that sells health and beauty products. As best we can tell, the "multilevel" business is some sort of scheme--or multiple schemes--where a salesman earns commissions based not

---

[2] Baca described his van as "kind of a truck closet."

[3] The compressor and lift alone cost about $2,000. Baca claimed to have a "contract" for their purchase, but was "not sure exactly if [he had] a receipt" for them. He also said he bought a used pump in 2011--the same year he bought the compressor and lift.

[*5] only on what he sells but also on how many others he can sign up to sell the products.  Mrs. Baca did help out with some of the marketing, but the Bacas don't seem to have earned much, if any, income from it during the years at issue.

*Advanced Stimulation Technologies (AST).*  Baca heard, probably in 2011, that there was good money to be made in the West Texas oilfields rejuvenated by the advent of fracking.  From 2011 through 2014 a company called AST paid Baca, who already had a commercial driver's license, to move and operate fracking equipment.  He was assigned to projects in the oilfields in and around Midland and Odessa, Texas, where he worked an average of 16 hours each day, 4 days a week.  And he did this all while maintaining his residence in El Paso.

Baca was an on-call employee, but he'd ask that AST give him at least four hours notice of a new project to allow him to make the commute from El Paso to Midland.  Certain projects required him to transport equipment or car pool with other workers to locations beyond Midland--trips that could take one to three hours one way.  Other projects required him to spend the night in Midland, where he would stay in onsite mobile homes or in his truck at a truck stop.  Otherwise, he'd take to the highway to make the long drive home to his family in El Paso after working a long day.  Every project was different, with some lasting weeks at a time, and others done within a day.  Even with this difficult commute, the Bacas

**[*6]** never considered moving to Midland because Mrs. Baca had a good job at the bank, and also because they say they didn't "know when [the job opportunities] would finish."[4]  Baca's intention was always to make good money while it lasted and then return to El Paso.  And that's exactly what happened--he made around $99,000 in 2012 and $74,000 in 2013 from these oilfield projects alone.

*Belly Dump Service.*  While Baca was in Midland for oilfield work, he "tried to make a business for the location" with one of his friends by purchasing a belly dump trailer and forming a partnership[5] to operate it in 2012.  The belly dump is "kind of a box, and you carry land," meaning the soil and dirt, etc., that is removed from the ground when a piece of land is being cleared.  And between 2012 and 2013, Baca and his friend used the belly dump to move the soil and dirt they cleared from oil-drilling land.  Baca claims the belly dump cost him $7,500 plus an additional $2,000 in maintenance and repairs (i.e., paint, brakes, and lights).

---

[4] Baca claims that his AST work was temporary and project-by-project, such that he never knew when it might end, yet he ended up working consistently for AST for nearly all of 2012 and 2013--the years at issue--as well as through 2014. He was later laid off at the beginning of 2015 when all the work dried up.

[5] Baca and his friend organized the business as a partnership and named it MEBA Oilfield Services.  The partnership agreement shows that Baca contributed the belly dump to the partnership, which means that Baca bought it but MEBA owned it.

[*7] But our own review of the contract[6] for the belly dump shows a purchase price of $6,700 and a downpayment of $1,000. This downpayment left a balance of $5,700. Baca sold the belly dump in 2013, he "think[s]".

*Other businesses.* Before the years at issue, Baca operated an oil-changing business called Master Lube, which he ran through B&B Express, LLC, from 2008 to 2011. He also opened an auto carrier business in 2008 that he used to move cars from New York to Mexico. He financed the carrier with a small business loan of $39,000 in 2008. This business became unprofitable, and he sold the carrier in 2012. As far as we can tell, Baca's operation of these businesses did not affect either the Commissioner's calculation of a deficiency or any income or claimed losses on the record before us.

## II. Returns, Trial, and More

### A. 2012 and 2013 Income Tax Returns

The Bacas timely filed their return for 2012, but were late with their return for 2013. Filed with both returns were Schedules C, Profit or Loss From Business, for Baca's multilevel marketing business, as well as Schedules A, Itemized

---

[6] While the contract is in Spanish, we feel confident in our ability to read pure numbers and combine these numbers with translations provided by the parties to arrive at our conclusion regarding the belly dump's purchase price.

**[*8]** Deductions, which showed large unreimbursed employee-business-expense (UEBE) deductions for Baca's "oil field" work.

The Bacas' returns do not make clear what income came from which business. We do have W-2 statements for the income Baca earned from AST and his wife earned from WestStar Bank.[7] DTS's income got mixed up with Baca's other income, though by trial Baca seemed to understand that each business should have had a separate Schedule C or other form.

B.    Audit and Trial

*Audit and Notice of Deficiency.* The Commissioner noticed these problems, and began an audit. That did not resolve the issues, so he refined them into a notice of deficiency for tax years 2012 and 2013. In this notice the Commissioner disallowed the vast majority of the Bacas' 2012 Schedule C deductions, all their 2013 Schedule C deductions, and UEBE deductions for both years. He topped off his notice with a late-filing addition to tax and two section 6662(a) penalties, but did determine that the Bacas were entitled to car and truck expenses of $1,548 and

_____

[7] The parties included in their stipulation a second 2013 W-2 for Baca that was not mentioned in the notice of deficiency, the pleadings, or anywhere else in the record. It showed that he earned $25,000 from a company named "Universal Pressure Pumping, Inc." We know nothing more about this job.

**[*9]** an adjustment for cost of goods sold of $6,438 for 2012, even though they

had not claimed these on their return.

We can summarize what remains in dispute. Here are the unreimbursed

employee-business expenses on the Bacas' Schedules A:

| | 2012 | Disputed? | 2013 | Disputed? |
|---|---|---|---|---|
| Mileage | $20,260 | Yes | $17,804 | Yes |
| Overnight travel | 32,500 | Yes | 32,500 | Yes |
| Total[1] | 52,760 | --- | 50,304 | --- |

[1] These totals are what's in dispute, not what's disallowed, because they don't account for the 2% floor on miscellaneous itemized deductions. See sec. 67(a). The Tax Cuts and Jobs Act, Pub. L. No. 115-97, sec. 11045(a), 131 Stat. at 2088 (2017), amended section 67 by adding subsection (g), which suspends the miscellaneous itemized deduction for tax years 2018 through 2025. We apply the law as in effect for the tax years in question.

And here are the business expenses on the Bacas' Schedules C:

| [*10] | 2012 | Disputed? | 2013 | Disputed? |
|---|---|---|---|---|
| Contract labor | $9,000 | Yes | -0- | --- |
| Depreciation and section 179 expense deduction | 64,600 | Yes | $49,103 | Yes |
| Legal and professional services | 700 | No | -0- | --- |
| Office | 2,388 | No | -0- | --- |
| Repairs and maintenance | 2,152 | No | -0- | --- |
| Other (i.e., fuel) | 4,732 | Yes | -0- | --- |
| Total | 83,572 | --- | 49,103 | --- |

*Trial.* The Bacas timely petitioned our Court, and we tried the case in El Paso.[8] Baca's testimony allowed us to piece more of his story together--but also left some things unclear. He told us about his different businesses, his alleged home office, and which vehicles and tools he and his wife depreciated or expensed on their Schedules C.

These depreciation and section 179 deductions were especially difficult to understand. According to Baca, he drove a 2008 Isuzu car and his wife drove a 2004 Honda Odyssey van during 2012--the costs of which he says were deductible for that year. These cars were not listed on the Bacas' 2012 Form 4562,

---

[8] The Bacas lived in Texas at all relevant times, which means this case is appealable to the Fifth Circuit. See sec. 7482(b)(1)(A).

[*11] Depreciation and Amortization, but were listed on an attached "2012 Asset Detail Report" submitted with the parties' stipulation. We also find that Baca bought his belly dump in 2012 and paid for its maintenance in that year. He deducted the cost of some tools and equipment in 2012 that he had bought in 2011 because, he said, he "never did it in 2011." In 2013 Baca says he bought a new Honda Oydssey for his wife--the cost of which they deducted.

The Bacas' home-office expenses were even less clear. When questioned about a deduction for his family's household utilities, Baca said that "[t]he thing is * * * in my house I have my office" and that this office is for DTS and also "for [his] other businesses except for any duties related to [his] oil field position." He testified that the home office comprised both a single room that's around 200 square feet, and a backyard shed where he stored supplies, and which cost him about $5,000 to build. Baca reported on his 2012 return, however, that the shed and other unspecified "equipment" cost a total of $42,000, and he deducted $20,000 of that total under section 179.

What made this still more confusing is that the Commissioner seems to think that this testimony related to the Bacas' 2012 Schedule C "[o]ffice expense" of $2,388. But the Commissioner did not list this item as in dispute in the notice of deficiency, and it seems fairly clear to us that Baca's testimony--though lacking

[*12] specifics--directed us to the $20,000 section 179 deduction and $1,100 depreciation deduction that the Bacas took for "office/storage." The Bacas did not attach Forms 8829, Expenses for Business Use of Your Home, to either their 2012 or 2013 return.

Baca shed more light on his UEBE deductions. He said these were for his "gas, meal, [and] insurance" costs while working in Midland and that he had provided his return preparer with the receipts and bank statements to prove these deductions. He also provided us with a summary of expenses for 2012, which includes payments for his car insurance, his cell-phone, and some of his other utility bills.

OPINION

This leaves us with an unusually messy substantiation case, which we start to untangle by noting that it is up to the Bacas to show that they are entitled to the deductions they took for 2012 and 2013. See Rule 142(a). The Bacas, however, urge us to look only to the administrative record compiled during the audit. When considering just this record, they insist we must find that the Commissioner's notice of deficiency is "defective and perfunctory" under the Administrative Procedure Act (APA), 5 U.S.C. secs. 501-559, 701-706 (2006), because it is

**[*13]** arbitrary, capricious, and an abuse of discretion.[9]  The Bacas also argue that, if this case is reviewed *de novo*, they have substantiated every deduction that the Commissioner disallowed.  The Commissioner disagrees.

I.    Substantiation

Section 162(a) allows taxpayers to deduct all "ordinary and necessary" expenses paid in carrying on a trade or business, see sec. 1.162-1(a), Income Tax Regs., but generally doesn't allow deductions for personal, living, and family expenditures, sec. 262(a).  To establish entitlement to a trade or business expense deduction, a taxpayer must provide sufficient records to substantiate the expense. Sec. 6001; Shea v. Commissioner, 112 T.C. 183, 186 (1999).  Credit card and bank statements may be sufficient to show that an expense was paid, but usually aren't good enough without more to show that it was related to a trade or business

---

[9] We won't discuss this issue beyond noting that the Bacas have preserved it.  We have already held that the default provisions of the APA do not apply to our deficiency cases.  See Ax v. Commissioner, 146 T.C. 153, 161-63 (2016). Every circuit court to consider the question has agreed with us.  See QinetiQ US Holdings, Inc. & Subs. v. Commissioner, 845 F.3d 555, 559-61 (4th Cir. 2017), aff'g T.C. Memo. 2015-123; Bratcher v. Commissioner, 116 F.3d 1482 (7th Cir. 1997), aff'g without published opinion T.C. Memo. 1996-252; Clapp v. Commissioner, 875 F.2d 1396, 1403 (9th Cir. 1989); see also Humphreys v. United States, 62 F.3d 667, 672 (5th Cir. 1995) (the Code and not the APA provides a basis for review of a taxpayer's tax liability).

**[\*14]** because such statements often don't show an expense's purpose.  See, e.g., Fessey v. Commissioner, T.C. Memo. 2010-191, 2010 WL 3397474, at \*4.

Section 274(d) makes proving a business expense even harder where the line between personal and business expenses is blurry.  This section affects expenses for entertainment, meals, lodging, and deductions for certain kinds of property such as cars.  Secs. 274(d), 280F(d)(4)(A); sec. 1.274-2(b)(1), Income Tax Regs.  When such expenses are at issue, taxpayers must have proof of:

- the expense's amount,

- the time and place it was incurred, and

- a description of its business purpose.

Sec. 274(d) (flush language); sec. 1.274-5T(b)(3), (6), Temporary Income Tax Regs., 50 Fed. Reg. 46015, 46016 (Nov. 6, 1985).

The records that section 274 requires may be any document that can establish any of these three elements but are usually an account book, a diary, a log, a statement of expenses, or trip sheets.  See sec. 1.274-5T(c)(2)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).  Section 274 bars us from estimating such expenses.

**[\*15]** A.    <u>Schedule A Unreimbursed Employee Expenses</u>

We'll begin with the Bacas' Schedule A deductions for UEBE. They claimed more than $50,000 of such expenses on both their 2012 and 2013 tax returns. The amounts claimed were comprised of mileage and travel expenses-- expenses subject to section 274. The Commissioner disallowed these in full, and claims that the Bacas have failed to adequately link the expenses to a business purpose.

On their returns, specifically on their Forms 2106-EZ, Unreimbursed Employee Business Expenses, the Bacas limited their UEBE deductions to two items: "mileage" and "travel expense while away from home overnight, including lodging, airplane, car rental, etc." The return (and its instructions) specifically state, "**Do not** include meals and entertainment" as travel expenses. And the Bacas did not claim a specific deduction for "meals and entertainment" expenses on either of the returns at issue. At trial, however, Baca stated that he provided receipts for meals in Midland to his tax preparer, and the Bacas even listed a grocery expense as proof of their UEBE mileage and travel expenses in their brief. If the Bacas claimed any grocery bills as mileage or travel expenses, they are out.

- 16 -

**[\*16]**       1.       <u>Amount and Time of Mileage; Overnight and Travel Expenses</u>

The cost of lodging can be a business expense, and the Bacas deducted $32,500 for lodging in 2012. Baca credibly testified that during his stays in Midland that year he either slept in his car or stayed in a mobile home at a cost of around $400 to $500 a month. There is no proof in the record of such expenses that satisfies section 274(d)'s stringent requirements. A cost of $400 to $500 a month for lodging in Midland would be reasonable, but it would mean the total amount for each year would be only between $4,800 and $6,000--nowhere close to what the Bacas claimed. And without some sort of detailed record showing the exact amount of Baca's lodging expenses, we simply cannot allow the Bacas this deduction.

Mileage can also be a deductible business expense, and the Bacas deducted more than $20,000 in mileage for 2012 and just over $17,800 in 2013. But these expenses are also subject to the heightened substantiation requirements of section 274(d). Baca did not have a log or notebook in which he kept track of his business travel. He instead provided credit-card statements, which demonstrate that he spent a significant amount of time in Midland, and spent money at what seem to be gas stations there. But without something like a log of the trips he made to

**[\*17]** Midland, Baca cannot adequately establish how many miles he drove for his oilfield work--especially since he also operated the belly dump in the same area.

We disallow these deductions.

### 2. Baca's 2012-13 Tax Home

There's a second problem lurking with these expenses. Even if Baca's credit-card statements were sufficient for us to determine how often he drove to Midland in 2012 and 2013, he would still need to show that his "tax home" wasn't where he was working. The reason is that section 162(a)(2) requires a taxpayer be "away from home" to deduct travel expenses in pursuit of a trade or business. This is one of those instances in tax law where an ordinary word means something different from what normal people might think it means--courts continue to hold that a taxpayer's "home" for tax purposes is not where he lives but is the vicinity of his principal place of business, where he has a permanent job, or at least where he is working indefinitely. The leading case on this issue is Commissioner v. Flowers, 326 U.S. 465, 473-74 (1946), where the Supreme Court made clear that keeping a house far away from where one works is a personal decision, which makes the expenses of going back and forth to work a nondeductible personal expense. See sec. 262(a). Baca is careful to point out that he didn't expect his work for AST to last forever--he never thought of it as a permanent job. But we

[*18] have to look at the facts and circumstances to decide whether it was "sufficiently indefinite", see Markey v. Commissioner, 490 F.2d 1249, 1255 (6th Cir. 1974) (quoting Six v. United States, 450 F.2d 66, 69 (2d Cir. 1971)), rev'g T.C. Memo. 1972-154, and the Code makes clear that "the taxpayer shall not be treated as being temporarily away from home during any period of employment if such period exceeds 1 year," sec. 162(a) (flush language).

The Fifth Circuit--where this case would go on appeal--has told us to look at four factors to decide whether a taxpayer's employment is sufficiently indefinite:

- whether the taxpayer's job required him to travel to the distant worksite;

- where the taxpayer spends more of his time;

- where the taxpayer engages in greater business activity, even if he still maintains business at his perceived place of abode; and

- where the taxpayer derives a greater proportion of his income.

See Robertson v. Commissioner, 190 F.3d 392, 395-96 (5th Cir. 1999), aff'g T.C. Memo. 1997-526; Putnam v. United States, 32 F.3d 911, 916-17 (5th Cir. 1994); see also Ham v. United States, 408 F.2d 671, 672 (6th Cir. 1969) (construction worker spent four years working on a project distant from place where family resided, returning only on weekends, was away indefinitely); Ney v. United States, 171 F.2d 449 (8th Cir. 1948) (denying travel deductions as personal where

[*19] taxpayer spent six-sevenths of his time working in one city away from his place of abode).

In Robertson, a Mississippi Supreme Court justice worked in Jackson where his court was located, but lived with his family in Oxford where he also taught a course at Ole Miss law school. Robertson, 190 F.3d at 394. Each Sunday afternoon, the justice would drive from Oxford to Jackson where he would remain through Thursday afternoon to fulfill his duties as a judge before returning home to his family and professorial duties in Oxford. Id. The Fifth Circuit denied his claimed deduction for travel and meal expenses because it found that the justice spent most of his time and earned most of his money in Jackson. Id. at 396-97. The Court also didn't think the justice's status as an elected state official was enough to find that the exigencies of business required him to travel from Oxford to the state capital. Id. at 397.

So was Baca's work in Midland "sufficiently indefinite" such that Midland became his tax home during the years at issue? We don't doubt the sincerity of the Bacas' belief that the oilfield work was too likely to prove temporary to justify thinking about moving from El Paso to Midland. The key fact, however, is that Baca's job with AST did not require him to travel back and forth to Midland. Baca chose to take the job in Midland because he knew the job paid well and he

[*20] hoped to earn a lot of overtime. And he was right about this--the record shows that he spent an average of 16 hours a day, 4 days a week, from 2011 through 2014 working in Midland. Some projects may have been shorter, and some longer, but he spent the bulk of his time working for AST. The fact that Mrs. Baca stepped in to help with Baca's multilevel business confirms for us that his Midland job consumed much of his time. What's more, even though Baca may have gone into the job with AST in 2011 worried that it could end at any moment, we find that at some point after his first year he felt some assurance that the work would continue. Buying a belly dump and starting a business with it in Midland is evidence of such assurance. And finally, Baca's AST income was much higher than what he earned from his other businesses--nearly $100,000 versus $13,000 in 2012. That makes his situation quite similar to the judge's in Robertson. It is understandable that the Bacas didn't want to pack up their home and move to Midland, especially with Mrs. Baca's job at the bank, but the work in Midland was consistent for nearly four full years. The Bacas' decision to remain in El Paso was their personal decision.

While we recognize that Baca's work for AST seemed unlikely to last a lifetime, we don't think the law in this area cares about long-term career prospects as much as it cares about consistency and time spent working in a certain location

[*21] such that a person could make a reasonable choice to move there, even if it wasn't convenient for personal reasons. And there is nothing in the record to suggest that Baca went without work for any significant time while employed by AST. We therefore find that Baca's work in Midland was sufficiently indefinite to make Midland his tax home during the years at issue. This makes his travel expenses personal and nondeductible even if the Bacas had substantiated them.

### B.     Schedule C Deductions

The Commissioner also disallowed expenses taken on the Bacas' Schedules C.[10] For 2012 he disallowed different deductions they took that included depreciation and expenses for section 179 property, contract labor, and fuel. For 2013 he disallowed their lone depreciation and section 179 expense deductions.

### 1.     Depreciation

Section 167(a) allows a depreciation deduction for the exhaustion or wear and tear of property used in a trade or business or held for the production of income. To substantiate their depreciation deductions, the Bacas have to demonstrate that the property was used in one of their trades or businesses and also "establish the property's depreciable basis, by showing the cost of the

---

[10] We note here again that many of these expenses were not properly reported as the Bacas lumped them onto one Schedule C--for "retail sales support"--that doesn't fit with what we know about Baca's different businesses.

[*22] property, its useful life, and [any] previously allowable depreciation." Cluck v. Commissioner, 105 T.C. 324, 337 (1995). Some property types listed in section 179 get special treatment--even though they might be property that lasts for years, a taxpayer who buys them may deduct rather than depreciate their costs. Sec. 179(a), (d)(1). A taxpayer who chooses to deduct, however, must deduct the property's cost in the year he puts it into service in his trade or business--not before and not after. Sec. 179(a). And the deduction is limited to the taxpayer's aggregate taxable income derived from any of his trades or businesses during the taxable year. Sec. 179(b)(3). The taxpayer must also prove by adequate records how and from whom the section 179 property was acquired, and he must show when it was placed into service. Sec. 1.179-5(a), Income Tax Regs. (flush language). The heightened substantiation requirements of section 274(d) must also be met for proving the business use of "listed property." See Singh v. Commissioner, T.C. Memo. 2009-36, 2009 WL 349745, at *1.

*Belly dump.* Some of the best records in this case are those for the belly dump. The Bacas took a $9,500 section 179 deduction for the belly dump on their 2012 return. And the belly dump doesn't have to lurch over the section 274 hurdle for listed property--the Code doesn't consider such a specialized vehicle to be a "passenger automobile." See sec. 280F(d)(5)(B)(ii). That's not enough, however,

[*23] to sustain the deduction. For one thing, Baca's contract to buy the belly dump shows a price of $6,700, including a downpayment of $1,000--an amount nearly $3,000 less than the claimed deduction. Baca explained at least part of this difference as his inclusion in the belly dump's cost of $2,000 that he later spent to repair it. There are invoices in the record from "Mission Truck Sales" and "Wofford Truck Parts, Inc.," but there's no clear link to the belly dump. So we won't just add these unidentified "maintenance expenses" to the purchase price.

There's also another problem--MEBA, not Baca as an individual, operated the belly dump. Baca bought the belly dump in February 2012, but MEBA's partnership agreement plainly says that he contributed the "Hobb Belly Dump" to the partnership in exchange for a 50% ownership share in May 2012. The Bacas argue in their brief that the partnership agreement shows that the belly dump "continued to be placed in transportation services" through 2013. We don't doubt this at all, but what it means is that MEBA and not Baca used the belly dump for business in 2012. And MEBA didn't "purchase" the belly dump, because Baca contributed it to MEBA. See sec. 179(d)(1)(C), (2)(C)(i). That means no deduction for MEBA passes through to Baca to deduct on his joint return.

We can't ignore the partnership agreement and pretend the belly dump is Baca's section 179 property just because he bought it. Even if we did, we have

[*24] nothing to show that he used the belly dump in a business other than MEBA. See, e.g., Green v. Commissioner, T.C. Memo. 1998-356, 1998 WL 712461, at *3-*4. We can't even confirm that MEBA made enough income during 2012 to allow such an expense. We therefore find that the Bacas are not entitled to a section 179 deduction for the belly dump.

*All other--cars, tools, and office storage.* The Bacas took a $54,000 section 179 deduction for a category of expenses they called "all others" on their 2012 return. The Commissioner says the Bacas did not explain this category, but the parties submitted with their supplemental stipulation of facts a copy of the Bacas' 2012 tax return including a Form 4562 accompanied by a "2012 Asset Detail Report." The report lists two cars (a Honda and an Isuzu), office/storage, and tools. Baca explained that he was trying to deduct the costs of the Baca's cars, some work tools, and a storage shed in the yard of his home in El Paso. So we think we at least know what was in the "all others" category.

We'll start with the cars. These deductions require heightened substantiation because cars are listed property. Secs. 274(d)(4), 280F(d)(4)(A)(i). We find Baca's testimony that he and his wife drove those cars during 2012 credible, but we don't have any evidence that they bought these cars and placed them into service in a trade or business in 2012. We also don't have any evidence

[*25] in the record about what they cost. And we have none of the detailed evidence that section 274(d) requires about the cars' time and place of use, or their business purpose. That makes the cars' cost not deductible.

Turning to the tools, the Bacas run into a timing issue. Baca admitted that he bought the tools in 2011 for his mobile 18-wheeler service, but didn't take a first-year expense deduction until 2012 because he just "never did it." Section 179 property must be deducted in the year it is placed in service, sec. 179(a), which is the time when it is "placed in a condition or state of readiness and availability * * * in a trade or business," sec. 1.167(a)-11(e)(1)(i), Income Tax Regs. This even includes property that is "acquired and set aside during the taxable year." Sec. 1.46-3(d)(2)(i), Income Tax Regs.; see also sec. 1.167(a)-11(e)(1)(i), Income Tax Regs. (stating that section 1.46-3(d)(2), Income Tax Regs., applies for purposes of determining when property is placed in service). We therefore find that the Bacas can't deduct the cost of these tools for 2012.

That leaves a $20,000 section 179 expense, plus an $1,100 depreciation expense, for unspecified equipment associated with Baca's purported office and an "office/storage" unit that Baca says he built in his backyard. He listed the total cost of these office/storage assets as $42,000. There are problems here too. Section 280A generally disallows deductions claimed for expenses associated with

[*26] the business use of a taxpayer's home. There are exceptions, and one of them is for "[c]ertain storage use" where the expense is "allocable to space within the dwelling unit which is used on a regular basis as a storage unit for the inventory * * * of the taxpayer held for use in the taxpayer's trade or business of selling products at retail or wholesale, but only if the dwelling unit is the sole fixed location of such trade or business." Sec. 280A(c)(2).

So there may be something here. But the only evidence that we have about this storage unit and office is Baca's testimony. He credibly testified, if perhaps with a bit of exaggeration, that his "wife [would] kill [him] if [he] put everything in [the] garage," so he built the storage unit for "equipment [he has] and that's part of * * * the storage and office" that he uses for DTS and his other businesses, with the exception of his oilfield work. That's not enough, though--he didn't produce any photos of the storage unit, or any bills to establish its construction cost or the cost of any of the unspecified office "equipment". He also didn't say how regularly he used the unit or describe the type and use of the equipment that supposedly makes up the rest of the $42,000. And while the Bacas have businesses that very well may result in inventory that requires at least some storage space, we are very skeptical that the Bacas paid $42,000 for office and

[*27] storage-unit costs for businesses that made less than $13,000 in the same year. These expenses are disallowed, too.

*Honda Odyssey.* The Bacas don't fare any better with their claimed section 179 deductions for the next tax year. They claimed a deduction for a Honda Odyssey on their 2013 return. But the Commissioner correctly points out that the only evidence in the record about this deduction is Baca's testimony, which is less than clear and seems to admit that the family used the Odyssey only for personal purposes. That is much less than section 274 requires, so the Bacas are not allowed to take this deduction.

*'97 Chevrolet Mobil.* The other section 179 expense the Bacas took on their 2013 return was for a used Chevrolet. There is zero evidence allowing us to confirm what exactly this $11,000 expense is for, let alone the "Chevrolet's" purchase price, when it was purchased, or the year that it was placed in service. This expense--whatever it is for--is therefore also disallowed.

> 2. Contract Labor

The Bacas also claim a deduction for $9,000 worth of contract labor in 2012. This expense, they say, was to hire Pancho Merced to handle DTS's chile-bag relabeling work. Even if we look past the fact that this deduction was listed on a Schedule C for "retail sales support," we still don't think the Bacas have

[*28] substantiated it. Baca's only evidence was his testimony that he paid Pancho by giving him a debit card linked to the Bacas' account so that Pancho could make cash withdrawals. Although the Bacas introduced copies of their bank records for the year, there's no evidence of what each withdrawal was for, or which withdrawals from which bank accounts were for those putative Pancho payments.

We disallow this deduction.

### 3. Other Deductions (Fuel)

The final disputed item is the Bacas' 2012 "other expenses" deduction for fuel. We'll assume these fuel expenses relate only to Baca's personal businesses, and not the expense of his commuting to the oilfields. In support of this deduction, the Bacas again pointed to the copies of their bank records, but provided no receipts and no log that tracks the time they spent driving for business purposes. We cannot know what part of these fuel expenses was for personal rather than business purposes, and the bank records fail to make the distinction any clearer. We recognize that the Bacas were running multiple businesses and must have had some legitimately deductible vehicle expenses. The Commissioner himself allowed some such expenses during the audit that the Bacas didn't even claim on their return. But bank records alone don't show what section 274(d)

**[\*29]** requires, or even what we need to distinguish an expense of one business from an expense of another. They cannot take this deduction either.

This means the Bacas may not take any of their contested Schedule C deductions.

## II.    Penalties

The last issue for us to resolve is whether the Bacas are liable for penalties. There are two--a section 6651(a)(1) late-filing penalty for 2013, and a section 6662(a) accuracy-related penalty for each year. The Bacas don't contest the late-filing penalty.[11] This leaves us with the accuracy-related penalties. Section 6662(a) imposes a 20% penalty for an underpayment of tax attributable to "[n]egligence or disregard of rules or regulations" or a "substantial understatement of income tax." Sec. 6662(b)(1) and (2), (c), (d). The Commissioner has the initial burden of production on these penalties under section 7491(c).[12] He meets

---

[11] They did not assign error to the Commissioner's failure-to-timely-file addition to tax in their petition. In their pretrial memorandum, they did say that they would "produce evidence to establish that they filed [their] income tax return for 2013 on time and even if it was late it was due to reasonable cause and not willful neglect." But they offered no such evidence at trial, and they never addressed the issue again. This amounts to a concession. See Swain v. Commissioner, 118 T.C. 358, 365 (2002).

[12] We have already granted the Commissioner's motion to reopen the record and admitted his penalty-approval form. See sec. 6751(b)(1); Graev v.

(continued...)

[*30] part of his burden for substantial-understatement penalties here because the Bacas' understatements are more than the greater of $5,000 or 10% of the tax they should've reported each year. See sec. 6662(d)(1)(A). He also meets the initial part of his burden for negligence because the Bacas should've known that many of their return positions were too good to be true, and they made no real effort to ascertain the correctness of those positions. See sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

But the Bacas claim they're not liable for the accuracy-related penalties because they had reasonable cause for their return positions and acted in good faith when they took them. See sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs. The Bacas never explained the basis of their reasonable cause or showed any evidence of good faith for their return positions in either year. The most they can do is point to Baca's testimony where he said: "My accountant put together everything * * * [h]e put together this business with my other income." We could stretch this statement to suggest that the Bacas are claiming that they acted out of reasonable reliance on an adviser, see Neonatology Assocs., P.A. v.

---

¹²(...continued)
Commissioner, 149 T.C. 485, 493 n.14 (2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing and overruling in part 147 T.C. 460 (2016).

[*31] <u>Commissioner</u>, 115 T.C. 43, 99 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002), especially since we are sympathetic to the language barrier that the Bacas face. But we simply do not have enough information to properly review the factors that proof of this reliance requires:

- the Bacas' return preparer was a competent professional who had sufficient expertise to justify reliance;

- the Bacas provided necessary and accurate information to their return preparer; and

- the Bacas actually relied in good faith on their return preparer's judgment.

<u>See</u> <u>id.</u> We know nothing about the Bacas' "accountant", much less enough to decide whether he was a competent professional with sufficient expertise to justify their reliance. We therefore find that the Bacas have not established that they had reasonable cause for their return positions.

This all means that

<u>Decision will be entered for</u>

<u>respondent</u>.